[No. S041008. July 23, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JAIME ARMANDO HOYOS, Defendant and Appellant.

## Counsel

Michael Snedeker and Lisa R. Short, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Meagan J. Beale and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CHIN, J.**—During the evening of May 26, 1992, Daniel and Mary Magoon were killed in their home and their three-year-old son J. was wounded. In 1994, a San Diego County jury convicted defendant Jaime Armando Hoyos and codefendant Jorge Emilio Alvarado of the first degree murders of Daniel and Mary Magoon. (Pen. Code, §§ 187, 189.)[1] It acquitted defendant and Alvarado of attempted murder as to J. (§§ 664, 187, subd. (a)), but convicted them of the lesser included offense of assault with a firearm. (§ 245, subd. (a)(2).) The jury further found that defendant and Alvarado personally used a firearm (§ 12022.5, subd. (a)), and found true the special circumstances that the murders were committed while defendant and Alvarado were engaged in the commission or attempted commission of robbery, in violation of section 211, and of burglary, in violation of section 459. (§ 190.2, subd. (a)(17).) It also found true a multiple-murder allegation. (§ 190.2, subd. (a)(3).)[2] Before the penalty phase, the trial court granted Alvarado's motion for new trial, but denied defendant's.[3] After a penalty trial, the jury returned a verdict of life without possibility of parole for the murder of Daniel Magoon, and of death for the murder of Mary Magoon. The trial court denied defendant's motions for new trial (§ 1181) and to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The jury also found defendant and Alvarado guilty of the following: conspiracy to commit robbery (§§ 211, 182), robbery in the first degree (§ 211), burglary (§ 459), grand theft of a firearm (§ 487(d)(2)), and transporting more than 28.5 grams of marijuana (Health & Saf. Code, § 11360, subd. (a)).

[3] We discuss the basis for the new trial motions after the guilt phase but before the penalty phase in part IV.F. Alvarado subsequently pleaded guilty and was sentenced to life without the possibility of parole.

## I. FACTS

A. *Guilt Phase*

1. *The Prosecution's Case*

a. *Evening of May 26, 1992*

On May 26, 1992, Daniel Magoon, his wife Mary, and their children, D. (age seven) and J. (age three), were living on Steele Canyon Road in the Jamul area of San Diego County. Daniel Magoon operated a large-scale marijuana distribution business out of the garage of their house. He also kept weapons and money in the garage. A security gate around the house was usually closed.

Jimmy Johnson was a longtime friend and occasional partner of Daniel Magoon in the marijuana trade. In 1974, both Daniel Magoon and Johnson had pleaded guilty to intent to distribute a controlled substance. Johnson testified that he was not involved in dealing marijuana with Daniel Magoon at the time of Magoon's death.

Around 8:30 p.m., Daniel Magoon visited Johnson at Johnson's residence. Magoon told Johnson that he was expecting some people to come over to the Magoon house that evening, and then left Johnson's residence. That day, Johnson had seen Magoon with a stack of money, possibly as much as $250,000. Johnson never heard from Daniel Magoon again.

Around 7:45 p.m., the Magoons' next-door neighbor, Mary Jane Lange, entered her bedroom to read. Her bedroom windows were open. About 40 minutes later, Lange heard Daniel Magoon's voice and at least one other male voice. She heard Magoon say something like, "Oh, come on." Sometime between 10:30 p.m. and 11:30 p.m., Mrs. Lange heard what sounded like four firecrackers, in rapid succession, that came from the direction of the Magoon residence. Between five and 15 minutes later, Mrs. Lange heard a series of four to seven more firecracker noises in rapid succession, again coming from the direction of the Magoon house. Mrs. Lange's live-in son-in-law, Kenneth Wall, heard what sounded like four gunshots sometime between 11:00 p.m. and 11:30 p.m.

b. *Auto Stop and Arrest of Defendants*

About 12:20 a.m., on May 27, 1992, El Cajon Police Officer William Pettus was on patrol when he noticed the rear license plate light was out on a passing Toyota Corolla. Officer Pettus stopped the Corolla, exited his patrol

vehicle, and approached the car. He saw Alvarado in the driver's seat and defendant in the front passenger seat. Alvarado was shaking; he appeared nervous and was sweating, although the evening temperature was cool. Officer Pettus asked Alvarado for his driver's license and vehicle registration. Alvarado handed him a California identification card with the name "Ralph Varela." Alvarado told the officer that defendant had a driver's license, and the officer asked both Alvarado and defendant for defendant's license, but defendant did not produce one. After returning to his patrol car and determining that there was no record that either defendant or "Varela" had a valid driver's license, the officer began to write a citation and called for police backup.

El Cajon Police Officer Christopher Pietrzak arrived at the scene shortly thereafter. Officer Pettus ordered defendant and Alvarado out of the car. Officer Pietrzak watched defendant and Alvarado, while Officer Pettus searched the Corolla. Officer Pettus searched the driver's side and found a nine-millimeter gun magazine (containing 12 rounds), and two large-caliber rounds. On the passenger side, under the seat, he found a loaded nine-millimeter semiautomatic Egyptian-manufactured Helwan pistol. It had one round in the chamber and eight rounds in its magazine. The Helwan pistol matched a gun box later found in the victims' house for a gun that Daniel Magoon owned.

Officer Pettus then searched the backseat of the car, where he found phone bills, rental agency forms, and a license plate. He searched the trunk and found approximately 28 pounds of marijuana, some of which was frozen, both in brick form and inside plastic baggies contained in boxes. A latent fingerprint removed from a piece of tape used to wrap the marijuana was later identified as Daniel Magoon's.

Officer Pettus arrested Alvarado and defendant. The officer conducted a patdown search of Alvarado before placing him in a patrol car. He found an empty nine-millimeter casing in Alvarado's left front pants pocket. After placing Alvarado in a holding cell, the officer checked the backseat of the patrol car and found two nine-millimeter cartridges. A strip search of Alvarado yielded a rock of methamphetamine.

At the police station, Officer Pietrzak searched defendant and found $1,033 in various denominations in his right rear pants pocket, and three $1 bills in a front pocket. He also found defendant's Mexican driver's license.

c. *Discovery of the Murders*

On May 27, 1992, about 7:00 a.m., seven-year-old D. woke up in his home. He saw his three-year-old brother, J., sleeping on a futon in the living

room, woke him up, and asked him if he was okay. J. answered "yeah," and fell back to sleep. D., however, saw some blood on J. He then found the body of his mother, Mary Magoon, in the bathroom. He found his father's body in the kitchen by the microwave. D. attempted to use the telephone to call 911 or the police, but was unsuccessful. He left to go to his best friend's house down the street.

At approximately 7:30 a.m., Patricia Bagnell was jogging through a field behind a 7-Eleven store in Jamul. She encountered D., barefoot, walking quickly down the side of a dirt road. D. looked pale and was crying. She said hello, and asked him why he was crying. He said that his parents were dead and there was a lot of blood in his house. She walked with him towards the residence of his best friend, where they encountered Richard Brewer. Brewer asked if they needed help. Bagnell told Brewer that D. had told her that his parents were dead. Brewer asked D. where he lived, and the three of them drove to D.'s house. When they arrived at the Magoon residence, both security gates were open and they pulled into the driveway.

The front door was open, and Brewer entered the residence while the other two stayed in his truck. The house was a shambles; everything was torn up. Brewer saw a little boy on the living room floor close to two rifles and a gun with a silencer. Brewer shook the little boy but got no response. Brewer got nervous and left to call for help, leaving the little boy where he was. Brewer, D., and Bagnell went to Bagnell's house nearby and called 911.

Firefighters arrived at the Magoon residence about 8:00 a.m. Brewer told Fire Captain Jeffrey Nelson that there was a bleeding child in the living room, and that there might be more people down the hallway. After making sure that police deputies were on their way, Captain Nelson entered the house through the front door. He noticed a "Mac-10" style submachine gun on the carpet just beyond the entry tile, later identified as an Ingram semiautomatic .45-caliber pistol with a barrel extension. As he walked into the entryway, he saw J. lying on a futon. As he moved toward the child, he saw two rifles that were lying parallel to each other, later identified as a Ruger Mini-14 semiautomatic .223-caliber rifle, and a .177-caliber air rifle.

J.'s hair was matted and wet from blood. The upper part of his T-shirt was covered with blood, which had spilled down onto his diaper. When Captain Nelson attempted to feel for a pulse, J. woke up and looked very scared. Captain Nelson then carried him outside to receive medical attention. J. had a laceration to the back of his head, and a six-to-eight-inch-long bruise in the left shoulder blade area. His head laceration was later determined to be a bullet wound.

Police deputies and other investigators went through the house. Daniel Magoon was found dead, lying on the floor in the kitchen area. Mary Magoon was also found dead, lying on her right side with her shoulder and head at the threshold of the hallway bathroom doorway. There was no evidence of forced entry to the Magoon residence.

### d. *Crime Scene Evidence*

Onsite investigation and later testing showed that multiple weapons had been fired in various rooms of the house, and that the house had been ransacked. No percipient witnesses testified about what happened in the house when the Magoons were shot. The prosecution relied on detailed crime scene evidence to establish its case.

### (1) *Entryway and Living Room*

Investigators found three guns in the entryway and living room: a .45-caliber semiautomatic pistol, a semiautomatic .233-caliber rifle, and a .177-caliber air rifle. The Ingram Mac-10 style .45-caliber semiautomatic pistol found at the entryway had a barrel extension (that resembled a silencer) and a magazine, but contained no ammunition. It had been improperly reassembled, and therefore could not fire. The Ruger Mini-14 semiautomatic .223-caliber rifle did not have a magazine, and had no rounds in the chamber. It had been fired before, but the testifying criminologist could not determine how recently. Blood on the trigger guard was tested and found to be consistent with defendant's blood type. The .177-caliber air rifle was operable and had been fired before, but it could not be determined how recently. Its barrel was bent in a downward direction, and had hair and blood on it. Blood on the trigger guard and forearm stock was tested and found to be consistent with defendant's blood. Blood on the barrel was consistent with Mary Magoon's blood.

On the floor was a woman's checkbook and wallet that had been rifled through, but contained a few dollars. There was also loose marijuana on the floor. One unexpended nine-millimeter cartridge was on the living room floor next to the fireplace.

### (2) *Kitchen*

On top of the kitchen island, investigators found a full 7-Eleven "Big Gulp" cup with Alvarado's fingerprints.[4] Daniel Magoon's face and upper body were covered with a blanket. His right hand held a clump of hair, later

---

[4] Marbell Lopez testified that there was a 7-Eleven store near the Magoon residence, and that she had driven defendant home from that 7-Eleven store at least once two months before the murders.

identified as J.'s. There were several nine-millimeter and .22-caliber casings on the floor near Daniel Magoon's body, and scattered across the kitchen counter area. A wallet containing Daniel Magoon's driver's license, business and credit cards, but no money, was on the floor.

### (3) *Hallway Bathroom*

One expended nine-millimeter bullet was found under Mary Magoon's right forearm. A second nine-millimeter bullet fell from her body as she was lifted onto a gurney. She held a clump of hair in her right hand, later identified as her own. She also held a clump of hair in her left hand, later identified as J.'s, and a baby pacifier. A baby blanket was lying between her legs. She was wearing pajamas.

There were three nine-millimeter casings in the hallway bathroom. The hallway bathroom door had two bullet holes at the base. The door had another bullet hole, and a blood spatter about five and one-half feet off the ground, which was consistent with either blunt force trauma or a gunshot. The blood on the bathroom door was consistent with that of Mary Magoon's blood.

The hallway carpet contained a bullet hole. A nine-millimeter casing was lying on the same carpet. There was blood on the wall across from the bathroom hallway about two and one-half feet off the ground, which was identified as a swiped application of blood onto the surface. This blood was consistent with the blood of either Daniel Magoon or J. There was fresh vomit on the hallway carpet located between where Mary Magoon's body was found and the kitchen.

### (4) *Master Bedroom*

Investigators found a nine-millimeter casing on the carpet at the end of the hallway or entrance to the master bedroom. The master bedroom door was open. The outside of the door had a bullet hole about three feet up from the floor with some black soot around it, indicating a close-range shot. Splinters from the door were lying on the floor in that area. A nine-millimeter casing was on a closet floor. An expended bullet that struck a chair was lying on the floor near a gun safe. The gun safe had a combination lock and keys, both of which had to be activated to open the safe door. Some keys were in the lock, but the safe door was closed and locked.

In the master bedroom bathroom there was a hidden storage compartment behind a slip-out shelf. This storage compartment contained a .30-caliber M-1 rifle. It also contained the gun box for the nine-millimeter Helwan pistol that Daniel Magoon owned.

### (5) *Two Bedrooms off the Hallway*

The Magoon residence had two bedrooms off the hallway. The door to one of the bedrooms appeared to have been recently kicked open. The doorjamb was cracked and splintered, and the striker plate and splinters were lying on the hallway carpet.

### (6) *Garage*

The garage contained marijuana debris, heat lamps, a fan, a trash compactor with wood blocks to make bricks of marijuana, an electronic scale, a vacuum sealer, and packaging material, such as plastic baggies, large garbage and plastic bags, and rolls of clear tape. A federal drug enforcement agent testifying as an expert witness stated that the equipment indicated that the persons in control of the premises were involved in the sale of marijuana, and that the type of marijuana and its packaging indicated Mexican origin. Also in the garage were two freezers, a chest-type and an upright-type.[5] Only the upright-type freezer was working, and it contained two packages with large quantities of marijuana stems and seeds, as well a large amount of marijuana debris at the bottom of the freezer. A roll-away tool chest contained "pay and owe" sheets, which are used to record drug transactions.

### e. *Autopsy and Medical Evidence*

### (1) *Daniel Magoon*

Daniel Magoon died from four gunshot wounds. A bullet hole on his left sleeve was surrounded by tiny marks from burning gunpowder, indicating the shot came from an "intermediate" range of a few inches to a few feet. The four shots probably were fired in rapid succession. It was unlikely he would have been able to walk after being shot because both of his lungs and his aorta had been perforated, and a bullet had penetrated his spinal cord; he probably died within 30 seconds of being shot. The toxicology report on Daniel Magoon showed 0.25 micrograms per milliliter of active cocaine present in his blood.

### (2) *Mary Magoon*

Mary Magoon's death was caused by gunshot wounds and blunt force injuries. She suffered four gunshot wounds, including one from a bullet that entered the back of her head, went through her brain, and exited her right

---

[5] The federal drug enforcement agent testified that marijuana dealers believe that storing marijuana in a freezer retains its potency.

forehead. In addition, the medical examiner identified at least seven separate blunt force injuries to her head. The severe injuries to her head alone could have caused her death. Her skull was severely fractured underneath the bruises and lacerations. The blunt force injuries to her head occurred before she died. These injuries could have been caused by the air rifle found on the living room floor.

Mary Magoon also had injuries to the rest of her body, including four separate injuries to her back. These injuries had imprints that were consistent with the shape of the air rifle. She had multiple injuries to her arms and hands. Her left ring finger was broken, and there were shallow cuts to her right wrist. Some of these injuries were consistent with "defensive wounds," which is a natural inclination to move the arms up to deflect blows. A laceration on the top of her foot contained embedded wood fragments, which the medical examiner opined were from the wood chips the gunshot hole created in the lower part of the hallway bathroom door. The toxicology report on Mary Magoon showed 0.98 micrograms per milliliter of active cocaine present in her blood.

### (3) *J.*

J. had two lacerations, an entry wound and an exit wound two inches apart, to the back of his head, indicating a bullet caused the penetrating injury. There was discoloration and burning of the skin which, the treating physician opined, indicated the gun was close to the entry wound. A brain scan indicated the brain had been injured, but J.'s wound was not life-threatening. An impact to the brain can cause nausea and vomiting.

### f. *Blood and DNA Testing*

Defendant's and Alvarado's clothing was taken as evidence the night they were arrested and later submitted for DNA testing, which revealed the following. Defendant was the possible source of the bloodstains on his T-shirt and of three separate bloodstains on his jeans. However, there was blood consistent with that of Mary Magoon on the right thigh of defendant's jeans. There was also blood consistent with that of either Daniel Magoon or J. on the left front pocket area of defendant's jeans. No blood was found on Alvarado's clothing.

### g. *Ballistic Evidence*

A firearms expert testified that his analysis of the recovered bullets and casings indicated that two nine-millimeter firearms were used at the crime scene. Daniel Magoon's Helwan pistol, which was found in Alvarado's car,

was the only nine-millimeter weapon recovered during the investigation, but none of the recovered nine-millimeter bullets or casings was fired by the Helwan. The Helwan had been fired at some point, but it was not possible to determine when.

Expert testimony also revealed that two expended bullets recovered from Daniel Magoon's body during the autopsy, and the expended bullet found on the master bedroom floor, were fired by one nine-millimeter weapon, but the expert could not determine the particular model. Either of the two nine-millimeter guns listed on the Department of Justice's records as registered to Alvarado (under the name "Ralph Varela") was the type of gun that could have fired the bullets, but there were approximately 75 other models of nine-millimeter firearms available on the market that could have also fired them.

The two expended bullets recovered under Mary Magoon's body were fired from the same gun, which was probably an Uzi-manufactured firearm. The Uzi magazine found in Alvarado's car could have fit into either a pistol or carbine Uzi weapon.

The firearms expert also testified that six of the nine-millimeter casings recovered were fired by one gun; five of the casings were found at the crime scene (including the three casings found near Daniel Magoon's body) and one casing was found in Alvarado's pants pocket when he was arrested. The three nine-millimeter casings found on the floor in the hallway bathroom (where Mary Magoon was killed) were fired from a different gun.

An unexpended cartridge found on the living room floor, and two unexpended cartridges found in the backseat of the patrol car where Alvarado was sitting, had been cycled through the same firearm that fired the three nine-millimeter casings found on the hallway bathroom floor. In addition, five .22-caliber casings were recovered at the crime scene, all of which were fired from the same gun.

### h. *Defendant's Dealings with Daniel Magoon*

Several times between February and May of 1992, Johnson was present at the Magoon residence, mostly in the garage, where Daniel Magoon, who knew some Spanish, spoke with Spanish-speaking men. Johnson identified defendant at trial as someone he had seen with Daniel Magoon at least once in the garage. Defendant had been at the garage in the company of one or two other persons. Johnson did not recognize Alvarado. Defendant had also been

in the company of a woman named "Maria" Lopez.[6] Johnson initially thought Maria Lopez and defendant were married, and assumed defendant's name was "Jaime Lopez." Johnson had identified defendant in a live lineup as "Jamie Lopez."

Marbell Lopez met defendant in 1991, and had a close relationship with him. In February 1992, she purchased a Ford Bronco for defendant with money he gave her. She would occasionally drive defendant to the Magoon residence, had been there with him four or five times, and had met Daniel Magoon there once or twice while with defendant. She also met Alvarado through defendant.

### i. *Alvarado's Firearms Use*

Thomas Lamb, who knew Alvarado, testified at trial. He stated that once, before the murders, Alvarado had displayed a nine-millimeter handgun to him.

Earlier on the day the murders were committed, about 3:00 p.m., defendant, Alvarado, Thomas Arroyo, and Jose "Chepe" Sanabia drove to a gun shop in San Ysidro, California.[7] Alvarado, using the name "Ralph Varela," purchased a Bersa, a .380-caliber gun manufactured in Argentina, which is smaller than a nine-millimeter gun and is called a "nine-millimeter short." Alvarado did not take the gun with him that day, because there was a 15-day waiting period. Sanabia picked up the gun after the waiting period.

On May 30, 1992, a detective searched Alvarado's residence in El Cajon. Underneath a drawer, the detective found an empty gun box for a semiautomatic nine-millimeter pistol. The serial number on the gun box matched the serial number of a weapon listed on the Department of Justice's records sold to "Ralph Varela" (Alvarado's alias).

### 2. *The Defense Case*

Neither codefendant testified.

### a. *Defendant's Driver's License*

An official from the Mexican consulate testified that defendant had a valid Mexican truck driver's license.

---

[6] Maria Lopez was apparently a friend of Johnson's wife. Lopez appears to be the same person as "Marbell" Lopez, who testified at trial.

[7] Sanabia identified defendant in a photographic lineup but could not identify defendant in court.

### b. *Daniel Magoon's Cocaine Use*

As noted, toxicological specimens collected during the autopsy indicated that Daniel Magoon had 0.25 micrograms per milliliter of active cocaine in his blood. Stephen Stahl, M.D., a psychiatrist and psychopharmacologist, testified that this level of cocaine would be consistent with Daniel Magoon's "being anywhere from mildly stimulated to being overtly crazy." Richard Whalley, a forensic scientist and toxicologist, testified that, given this cocaine level, Daniel Magoon could have exhibited a range of behavior, from being a little more than usually alert to paranoia.

### c. *Daniel Magoon's Firearms Use*

Arthur Coleman testified that on April 25, 1982, he was a deputy sheriff in Imperial County, and he encountered Daniel Magoon driving a van. Magoon appeared to be under the influence of alcohol, and Deputy Coleman arrested him. During an inventory search of the van, Deputy Coleman retrieved three loaded firearms, two unloaded firearms, approximately 1,000 rounds of ammunition, and two bundles of marijuana.

### d. *The Shooting of J.*

Pathologist Arthur Koehler, M.D., testified that he had reviewed the medical reports, photographs, and other records of J.'s gunshot wounds. Dr. Koehler testified that the bullet entry to J.'s scalp was "tangential," which meant that it was fired somewhat parallel to his scalp rather than at a right angle. Dr. Koehler stated that J.'s wound was consistent with a bullet passing through Mary Magoon's arm.

Forensic pathologist Irving Root, M.D., also testified about J.'s injuries. Dr. Root stated that if J. had been injured in the area of the hallway bathroom, one would expect to see a blood trail from that area to the futon where J. was found, but there appeared to be no such blood trail. Because of this, and because of the large amount of blood on the futon, it was Dr. Root's opinion that J. was on the futon within a few seconds to one minute after he began to bleed. Dr. Root testified that the vomit found on the hallway floor was consistent with J.'s vomiting after he sustained the scalp injury.

## B. *Penalty Phase*

### 1. *Prosecution Evidence*

The prosecution gave no opening statement, put on no evidence, and rested on the guilt phase evidence.

### 2. *Defense Evidence*

James Park, a correctional consultant and retired administrator for the California Department of Corrections, testified about the conditions of defendant's confinement, if he were sentenced to life without the possibility of parole.

Carrie Baker, who lived in Jamul, testified that, in the early morning of May 27, 1992, she heard approximately five muffled gunshots around 2:45 a.m. (which would have been after the time defendants had been arrested). Three or four days later, she read something about the murders, called a number that was listed for information about the case, and left her name and telephone number on an answering machine.

Eight members of defendant's family (his wife, three children, three brothers, and a sister) testified that they loved defendant and would be deeply saddened if he were put to death.

## II. PRETRIAL ISSUES

### A. *Denial of Motion to Dismiss the Special Circumstances*

Defendant filed a pretrial motion seeking dismissal of the special circumstance allegations on the ground they were an ex post facto application of the laws and therefore a violation of his state and federal rights to due process. The trial court denied the motion. On appeal, defendant contends the trial court erred in denying the motion and as a consequence violated his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution. For the reasons discussed below, we discern no error and no violation of defendant's due process rights.[8]

Defendant was charged with robbery and burglary special circumstances under section 190.2, as amended in 1990 by Proposition 115. Defendant

---

[8] Regarding this claim and most other claims raised on appeal, defendant contends that the asserted error or misconduct violated several constitutional rights. In many instances in which defendant raised issues at trial, however, he failed explicitly to make some or all of the constitutional arguments he now asserts on appeal. Unless otherwise indicated, his appellate claims either required no action by defendant to preserve them, or involved application of the same facts or legal standards defendant asked the trial court to apply, accompanied by a new argument that the trial error or misconduct had the additional *legal consequence* of violating the federal Constitution. To that extent, defendant has not forfeited his new constitutional claims on appeal. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1084, fn. 4 [40 Cal.Rptr.3d 118, 129 P.3d 321] (*Guerra*).) On the merits, no separate constitutional discussion is required, or provided, where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

contends that because this court decided the constitutionality of Proposition 115's amendments to section 190.2 *after* the commission of his crimes, charging the special circumstances violated the ex post facto clauses of the state and federal Constitutions. He also contends the special circumstances charges denied him due process because he lacked notice that he could be charged with the special circumstances.

Addressing defendant's claim requires a brief review of the history of Proposition 115. In June 1990, the electorate passed both Propositions 114 and 115, which contained different versions of section 190.2. (*People v. Superior Court* (*Clark*) (1994) 22 Cal.App.4th 1541, 1545 [28 Cal.Rptr.2d 46] (*Clark*).) Under the Proposition 114 version of section 190.2, the Legislature required a finding of intent to kill before the trier of fact could impose the death penalty on one who was not the actual killer. (*Clark, supra*, 22 Cal.App.4th at pp. 1544–1545.) Under the Proposition 115 version of section 190.2, however, the felony-murder rule applied, with no required finding that a defendant had an intent to kill. (*Ibid.*) The passage of Propositions 114 and 115 spawned litigation that challenged whether Proposition 115's amendments to section 190.2 were effective. (*Clark*, at p. 1546.) On June 25, 1992, we settled this issue in *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 992 [9 Cal.Rptr.2d 102, 831 P.2d 327]. *Yoshisato* held that Proposition 115's amendments to section 190.2 were operative, and went into effect the day of Proposition 115's passage in June 1990. The crimes in the present case were committed on May 26–27, 1992.

Defendant contends that the law was "unsettled" for the two-year period between the passage of Proposition 115 in June 1990, and our decision in *Yoshisato* on June 25, 1992, and that he lacked notice that a death judgment was proper in light of the actions constituting the two special circumstances charged. Defendant concedes that his argument fails under *Clark, supra*, 22 Cal.App.4th at page 1541. He apparently asks us to disapprove that case.

■ We decline to do so. As *Clark* observed, both the United States and California Constitutions forbid only " 'the retroactive application of an "unexpected" or "unforeseeable judicial enlargement of a criminal statute." ' " (*Clark, supra*, 22 Cal.App.4th at p. 1550.) Our decision in *Yoshisato* was neither "unexpected" nor "unforeseeable"; all that can be said of the state of the law during the two-year period was that it was "unsettled." (*Clark, supra*, 22 Cal.App.4th at p. 1550.) Defendant therefore was on notice that this court might find (as indeed we did) that the provisions of Proposition 115 were controlling. Consequently, the trial court did not err in denying defendant's motion to dismiss the special circumstances.

B. *Denial of Motion to Suppress*

Defendant claims the trial court erred in denying his section 1538.5 motion to suppress the evidence discovered in the traffic stop of Alvarado's car, in which defendant was a passenger. Defendant asserts the stop violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution, and that the trial court improperly admitted all evidence discovered after the stop. Defendant contends the officers based the stop in significant part on his ethnicity, in violation of the Fourteenth Amendment. He also contends that even if the initial stop was lawful, his detention was unnecessarily prolonged and therefore unlawful. For the reasons discussed below, we reject these contentions.

### 1. *Factual and Procedural Background*

At the suppression hearing, the two arresting officers testified. Their testimony was substantially identical to their testimony at trial, which is summarized in the statement of facts above. Officer Pettus also testified that he impounded the car because neither defendant nor Alvarado had a valid license. Once Officer Pietrzak arrived, Officer Pettus asked defendant and Alvarado to step out of the car. Officer Pettus then conducted an inventory search to make sure there were no valuables or other items in the car before he impounded it. Less than one minute elapsed from the time Officer Pettus asked defendant and Alvarado to exit the car, until the officer found a gun magazine containing 12 nine-millimeter rounds underneath the driver's side seat cover.

The trial court found that the initial stop was lawful and defendant's detention was not unduly prolonged. It therefore denied the motion to suppress.

### 2. *Analysis*

■ In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. (*People v. Ayala* (2000) 24 Cal.4th 243, 279 [99 Cal.Rptr.2d 532, 6 P.3d 193].) We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. (*Ibid.*) The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review. (*Ibid.*) Applying this standard, we discern no error in the trial court's denial of defendant's motion to suppress.

### a. *Stopping and Impounding the Car*

Defendant asserts that Officer Pettus stopped and impounded the car because defendant and Alvarado were two Mexican males, an act that would violate the federal Constitution's prohibition on the selective enforcement of the law based on ethnicity. But defendant did not raise the claim of ethnic bias below and consequently forfeits the issue on appeal. The claim also lacks merit. Defendant did not introduce any evidence at the suppression hearing showing the officers harbored ethnic bias or animus towards them. As defendant conceded at the suppression hearing, the license plate light on Alvarado's car was burned out, and Officer Pettus had probable cause to stop the car for a violation of Vehicle Code section 24601. As to impounding the car, defendant likewise presents no evidence of any ethnically motivated conduct by the officers.[9] Officer Pettus testified he decided to impound the car because neither defendant nor Alvarado had a valid license.

Defendant also contends that because a valid Mexican driver's license was later found on him, Officer Pettus's testimony that defendant did not produce the Mexican driver's license before the car was impounded is facially implausible. We disagree. As the trial court noted, it is quite conceivable that defendant and Alvarado did not want to reveal their true identities at the time of the stop. Defendant presented no evidence at the suppression hearing to controvert Officer Pettus's testimony that defendant said he did not have a driver's license and did not provide a license to the officer. Because neither occupant of the car produced a valid driver's license, the officer was authorized to impound the vehicle. (See Veh. Code, § 22651, subd. (p).)

### b. *Order to Exit the Car*

Defendant claims he was unlawfully detained either when the officer ordered him out of the car or during the period after he was ordered out of the car, and that there existed no reasonable, articulable suspicion of criminal activity to justify his detention.

■ Defendant's first contention fails because an officer making a traffic stop may, without violating the Fourth Amendment, order the driver and passengers to exit a car. (*Maryland v. Wilson* (1997) 519 U.S. 408, 410, 415

---

[9] Defendant claims an improper ethnic motive for the impounding occurred because the registered owner of the vehicle, Alvarado's wife, Sylvia Alvarado, lived close to where the vehicle was stopped. Defendant implies the officers had a duty to locate her before impounding the car, but he presents no authority to support his contention.

[137 L.Ed.2d 41, 117 S.Ct. 882] (*Wilson*).)[10] *Wilson* extended to passengers the rule in *Pennsylvania v. Mimms* that once a vehicle has been lawfully detained for a traffic violation, a police officer may order the driver to exit the vehicle without any articulable justification. (*Wilson, supra,* 519 U.S. at p. 410; *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111, fn. 6 [54 L.Ed.2d 331, 98 S.Ct. 330]; *People v. Maxwell* (1988) 206 Cal.App.3d 1004, 1009 [254 Cal.Rptr. 124].) Defendant relies on *People v. Gonzalez* (1992) 7 Cal.App.4th 381, 386 [8 Cal.Rptr.2d 640], a case decided before *Wilson,* that acknowledged a police officer could order a passenger out of a car lawfully detained for a traffic violation in order to protect the officer, or other reasonable justification. (*Maxwell, supra,* 206 Cal.App.3d at pp. 1009–1010.) Thus, even under the holdings of the pre-*Wilson* cases, the officers were justified in ordering the codefendants to exit the car.

### c. *Detention Outside the Car*

Officer Pettus's discovery of the gun magazine in the car clearly gave rise to reasonable suspicion to detain defendant and Alvarado for further investigation. The issue is whether defendant was unlawfully detained during the time period starting at the point he was standing outside the car being watched by Officer Pietrzak and ending at the point that Officer Pettus discovered the gun magazine. As discussed below, we conclude that defendant's detention during this time period was lawful as a brief continuation of detention for officer safety. (*Wilson, supra,* 519 U.S. at p. 410.)

" '[A] person has been "seized" within the meaning of the Fourth Amendment' . . . 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave.' " (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573 [100 L.Ed.2d 565, 108 S.Ct. 1975], citation and fn. omitted.) The high court later made clear that this test "states a *necessary,* but not a *sufficient,* condition for seizure." (*California v. Hodari D.* (1991) 499 U.S. 621, 628 [113 L.Ed.2d 690, 111 S.Ct. 1547].) In order for there to be a seizure under the Fourth Amendment there must also be an arrest, by the application of physical force or by submission to the assertion of authority. (*Id.* at p. 626.) As to whether defendant was seized when he was ordered out of the car, neither *Mimms* nor *Wilson* clarifies whether an officer's ordering the driver or

---

[10] *Wilson* was decided after the trial court denied defendant's motion to suppress. A high court decision construing the Fourth Amendment, however, applies retroactively to all convictions that were not yet final at the time the decision was rendered. (*United States v. Johnson* (1982) 457 U.S. 537, 562 [73 L.Ed.2d 202, 102 S.Ct. 2579].) Defendant's motion to suppress was made after the adoption of Proposition 8 in June 1982, which abolished the independent state grounds doctrine for the exclusion of evidence under the California Constitution. (See 4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Illegally Obtained Evidence, § 30, pp. 644–645.)

a passenger out of the car is to be considered a seizure. However, the high court has recently concluded that a *Mimms/Wilson* order is a seizure because it is reasonable for both the driver and passenger to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety. (*Brendlin v. California* (2007) 551 U.S. ___ [168 L.Ed.2d 132, 127 S.Ct. 2400, 2407].) In the situations in which a *Mimms/Wilson* order is used, there is a social expectation of unquestioned police command, which is at odds with any notion that a passenger would feel free to leave without advance permission. (*Ibid.*)

But while defendant was seized for the time period between the officer's ordering him out of the car and the officer's discovery of the gun magazine, his Fourth Amendment rights were not violated. The initial stopping of the car was valid, as was the subsequent *Mimms/Wilson* order by which the officer ordered the codefendants to exit the car. Consistent with the Fourth Amendment, detention following a *Mimms/Wilson* order may continue at least as long as reasonably necessary for the officer to complete the activity the *Mimms/Wilson* order contemplates. Here, the officers needed the codefendants out of the car and out of the way while the first officer did an inventory search of the car before impounding it. The second officer kept an eye on the codefendants in order to ensure the first officer's safety during his search. The trial judge found the period of detention may have been less than a minute, but at any rate was no more than a minute or two. Under these circumstances, we discern no violation of defendant's Fourth Amendment rights.

## C. Denial of Severance Motion

Defendant asserts that the trial court's denial of his severance motion violated his rights to due process of law, a fair trial, a reliable sentence, and the right to testify on his own behalf, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As discussed below, we conclude the trial court did not err in denying the severance motion.

### 1. Statements of the Jailhouse Informants

Several of defendant's claims on appeal, including the severance claim, relate to jailhouse informants George Jimenez and Jorge Flores and their statements. Neither Jimenez nor Flores testified at trial.

#### a. George Jimenez

Following defendant's and Alvarado's arrest after the car stop, Alvarado was incarcerated in the county jail. On May 30, 1992, Alvarado (under the

alias "Ralph Varela") was in a holding cell with several other inmates, including George Jimenez. In an interview on June 23, 1992, Jimenez told police the inmates were passing around a newspaper that included a story about the Magoon murders. While looking at the newspaper, Alvarado stated, "Hey, we did this." One of the other inmates said, "You're the ones that capped that little kid?" Alvarado laughed and replied, "Yeah." Enraged by Alvarado's admission, some of the inmates assaulted Alvarado.

### b. *Jorge Flores*

On the same day as Alvarado's jailhouse assault, defendant was incarcerated in a different jail, where he spoke with an acquaintance, Jorge Flores. The next day, June 1, 1992, during an interview with police detectives, Flores stated defendant told him he had taken a pistol that belonged to a shooting victim. Defendant told Flores that he and an unnamed companion were sent by their boss to the victims' house to either get back the marijuana their boss had sold to the victims or get the money the victims owed for it. Defendant stated that when they went to the victims' house the victims were not there, but when the victims arrived, the male victim saw they were waiting for him, and the victims went inside the house. Defendant and his companion knocked on the door; the door opened, or was broken down, and the male and female victims were inside holding weapons. The companion pulled his gun and shot one of the victims, and the bullet also hit one of the children in the head. The second victim tried to shoot, and defendant shot the second victim.

### 2. Aranda/Bruton *Issues*

Defendant and Alvarado moved to sever the trial on the ground that the prosecution's proposed admission of the jailhouse informants' testimony would violate *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]. *Bruton* and its progeny provide that if the prosecutor in a joint trial seeks to admit a nontestifying codefendant's extrajudicial statement, either the statement must be redacted to avoid implicating the defendant or the court must sever the trials. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 43 [17 Cal.Rptr.3d 710, 96 P.3d 30].) As to the Flores statement, the prosecution resolved any potential *Aranda/Bruton* issues when it limited its evidence to defendant's admission that he had taken a gun from the victim. As to the Jimenez statement, the prosecutor offered several possible redactions to avoid violating *Aranda/Bruton*, all of which the court ultimately deemed inadequate. The prosecutor then elected to proceed with a joint trial at which he would not introduce the Jimenez statement in his case-in-chief, although the parties understood it might be used for impeachment purposes. The trial court's final order was that the prosecution would not use the Jimenez statement in its case-in-chief at the guilt or penalty phases.

Section 1098 expresses a legislative preference for joint trials. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 40.) A trial court's denial of a motion for severance is reviewed for abuse of discretion, judged on the facts as they appeared at the time of the ruling. (*Id.* at p. 41.) But even if the ruling on a severance motion was correct when made, the reviewing court will reverse the decision if a defendant shows that joinder actually resulted in "gross unfairness," amounting to a denial of due process. (*People v. Johnson* (1988) 47 Cal.3d 576, 590 [253 Cal.Rptr. 710, 764 P.2d 1087].)

Because the trial court decided the severance motion entirely on *Aranda* and *Bruton* grounds, and because defendant does not claim the trial court erred in that ruling, he appears to concede the trial court's denial of the severance motion was correct. Defendant contends, however, that the court committed prejudicial error when it left open the possibility that if Alvarado testified, Jimenez could be called to impeach him. Defendant claims that because the trial court did not bar Jimenez's testimony *altogether*, the denial of severance resulted in gross unfairness amounting to a violation of due process. But defendant's claim that the trial court erred in not barring Jimenez's testimony altogether on *Aranda* and *Bruton* grounds is not viable. A codefendant's extrajudicial statement implicating another defendant need not be excluded when the codefendant testifies and is available for cross-examination.[11] (*Nelson v. O'Neil* (1971) 402 U.S. 622, 629–630 [29 L.Ed.2d 222, 91 S.Ct. 1723]; *People v. Boyd* (1990) 222 Cal.App.3d 541, 562–563 [271 Cal.Rptr. 738].)

### D. Denial of Motion to Hold an Evidentiary Hearing or Exclude Statements of Jailhouse Informants

Defendant asserts that the trial court erred in denying his motion to hold an evidentiary hearing concerning the admissibility of the jailhouse informants' statements, or to exclude them. He asserts the error denied him due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.[12] As discussed below, we conclude the trial court did not err in denying the motion.

---

[11] Defendant bases his claim that he suffered gross unfairness because Jimenez's testimony was not excluded altogether on his argument (discussed and rejected in pt. IV.F., *post*) that he suffered a *Brady* violation because the prosecutor made a late disclosure of evidence that undermined Jimenez's credibility. (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*).) But because defendant's *Brady* claim fails, so too does his derivative claim that the trial court's denial of severance later resulted in gross unfairness in the form of the alleged *Brady* violation.

[12] The trial court granted defendant's request for an evidentiary hearing to determine whether Flores was working as an agent for the police pursuant to *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], based on counsel's representations of a long-standing relationship between Flores and a police detective. The evidentiary hearing was

## 1. *Evidentiary Hearing*

■ Defendant contends that Evidence Code section 402 and the federal due process clause required the trial court to conduct an evidentiary hearing on the admissibility of Jimenez's testimony. Evidence Code section 400 et seq., sets forth the rules for determining the existence or nonexistence of a preliminary fact when the parties dispute its existence. A " 'preliminary fact' means a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence." (Evid. Code, § 400.) Evidence Code section 402, subdivision (b), provides in relevant part: "[I]n a criminal action, the court *shall* hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests." (Italics added.) But subdivision (b) of Evidence Code section 402 does not mandate, as defendant appears to contend, that a court must hold an evidentiary hearing on request. Subdivision (b) states only that if a court holds an evidentiary hearing concerning the admissibility of a confession or admission, then it must do so outside the presence of the jury, if any party so requests.

The pretrial defense motions asserted that jailhouse informants were inherently unreliable, but raised no "preliminary fact" concerning the admissibility of Jimenez's testimony beyond the undisputed fact that he was a jailhouse informant. Defendant's challenges to the reliability of the jailhouse informants therefore went to the weight of their testimony rather than its admissibility (Evid. Code, § 351), which the trial court correctly concluded in denying the motion by stating: "Jailhouse informants may not be the most trustworthy and perhaps believable individuals, but if there is competency to testify, they may testify." Therefore, at the time the trial court ruled on the defense's in limine motions, the defense had raised no admissibility issues concerning Jimenez that warranted an evidentiary hearing.[13]

Nor was the trial court required to hold an evidentiary hearing on federal due process grounds. Defendant correctly notes that under Evidence Code sections 402 and 405, the *voluntariness* of a confession is a "preliminary fact" that a trial judge must determine before the confession may be submitted to the jury. (*People v. Rowe* (1972) 22 Cal.App.3d 1023, 1029 [99 Cal.Rptr. 816].) In addition, under the federal due process clause, a defendant

---

held, but Flores failed to appear, and the trial court suspended the ruling on the motion to exclude his testimony until he could be found. Flores was not found and did not testify at trial.

[13] As recounted in part IV.F., *post*, after the return of the verdicts, the prosecutor disclosed Jimenez's admissions about his use of drugs that called into question Jimenez's competency to testify. Defendant argues that had the court granted the in limine motion for an evidentiary hearing for Jimenez, this information would have been revealed earlier, and defendant could have avoided the prejudice he suffered due to the prosecutor's late disclosure. We reject defendant's claims in part IV.F., *post*.

has a right to an evidentiary hearing on the issue of his confession's *voluntariness*. (*Jackson v. Denno* (1964) 378 U.S. 368, 376–377 [12 L.Ed.2d 908, 84 S.Ct. 1774]; *People v. Bennett* (1976) 58 Cal.App.3d 230, 236 [129 Cal.Rptr. 679].) Although the Jimenez statements reported Alvarado's admissions, defense counsel never raised the issue of the *voluntariness* of Alvarado's admissions to Jimenez. Rather, defense counsel claimed Jimenez's statements were *inherently unreliable* because Jimenez was a jailhouse informant. Therefore, the due process cases defendant cites are inapplicable.

### 2. *Motion to Exclude the Testimony of the Jailhouse Informants*

Defendant next contends the court should have excluded Jimenez's statements under Evidence Code section 352, and as a matter of federal due process.[14] Defendant asserts that jailhouse informant testimony is inherently unreliable, so that any probative value is outweighed by the testimony's prejudicial impact. Referring to the observations of state and federal courts (*People v. Duarte* (2000) 24 Cal.4th 603, 617–618 [101 Cal.Rptr.2d 701, 12 P.3d 1110]; *In re Wilson* (1992) 3 Cal.4th 945, 957 [13 Cal.Rptr.2d 269, 838 P.2d 1222]; *Northern Mariana Islands v. Bowie* (9th Cir. 2001) 243 F.3d 1109, 1114–1116), defendant seeks to document the unreliability inherent in jailhouse informant statements, and relies on many items outside the record on appeal.

Defendant has cited authorities indicating that courts are aware of reliability issues concerning jailhouse informants. But we have consistently rejected claims that the testimony of jailhouse informants is inherently unreliable. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1165 [64 Cal.Rptr.2d 892, 938 P.2d 950].) Nothing defendant presents here causes us to reconsider this conclusion. The abuse of discretion standard of review applies to any trial court ruling on the admissibility of evidence. (*Guerra, supra*, 37 Cal.4th 1067, 1113.) We conclude the trial court did not abuse its discretion or violate due process in denying defendant's motion to exclude the jailhouse informants' testimony.

### III. JURY SELECTION ISSUES

#### A. *Denial of Motion for Individual and Sequestered Juror Voir Dire*

Defendant claims the trial court erred in denying his motion for individual and sequestered juror voir dire, and thus violated his right to trial by an

---

[14] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

impartial jury and to due process of law under the Sixth and Fourteenth Amendments to the United States Constitution. As we explain, we conclude the trial court did not err in denying his motion.

Alvarado filed an in limine motion, in which defendant joined, seeking individual and sequestered juror voir dire. The trial court denied the motion, but left open the possibility of individual and sequestered voir dire for particular jurors on a showing of good cause. Subsequently, the court stated it intended to call 12 prospective jurors at a time for voir dire, followed by discussion of challenges for cause outside the jurors' presence. Defendant's trial counsel stated he had no objection to the court's proposed jury selection procedures.

As an initial matter, the People contend that counsel's acquiescence in the trial court's proposed jury selection process bars defendant's claim concerning individual and sequestered voir dire. But the parties stipulated that when the trial court made a ruling on an in limine motion, the losing party was not required to restate the objection in order to preserve it for appellate purposes (assuming that no evidence later presented changed the basis of the trial court's ruling). Defendant therefore did not forfeit his contention.

Defendant's claim fails on the merits, however, because, as defendant concedes, Code of Civil Procedure section 223, enacted as part of Proposition 115, abrogated the former individual voir dire procedure directed by *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301]. (*People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46], citing *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 1171 [71 Cal.Rptr.2d 91].) Defendant submits that *Covarrubias* was wrongly decided, and apparently invites us to reconsider the issue. We decline to do so. (*People v. Ramos* (2004) 34 Cal.4th 494, 512 [21 Cal.Rptr.3d 575, 101 P.3d 478].)

### B. *Prosecutor's Peremptory Challenges (Alleged* Batson/Wheeler *Error)*

Defendant contends that the prosecution's striking of Hispanic prospective jurors violated his right to equal protection under the Fourteenth Amendment to the United States Constitution. For the reasons discussed below, we conclude the trial court did not err in denying defendant's motion under *Batson v. Kentucky* (1986) 476 U.S. 79, 84–89 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*), and *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).

The prosecutor exercised peremptory challenges against three Hispanic jurors: M.A., L.H., and Y.M. Alvarado made an objection to each excusal

under *Batson/Wheeler*, in which defendant joined. The prosecution argued that the codefendants had not made a prima facie showing, given that one Hispanic juror, P.G., was on the panel. The trial court found no prima facie showing and denied the motion, basing its ruling on a review of the jurors' voir dire transcripts, which disclosed neutral grounds for the challenges, and on the presence of at least one Hispanic juror on the panel, P.G.

■ Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias. (*Batson, supra,* 476 U.S. at p. 89; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) Recently, "the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67 [33 Cal.Rptr.3d 1, 117 P.3d 622] (*Cornwell*), quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted (*Johnson*).)

The high court clarified that "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson, supra,* 545 U.S. at p. 170, revg. in part *People v. Johnson* (2003) 30 Cal.4th 1302, 1318 [1 Cal.Rptr.3d 1, 71 P.3d 270] [requiring the defendant to "show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias"].) " 'When a trial court denies a *Wheeler* motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. [Citations.] We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question.' " (*Guerra, supra,* 37 Cal.4th at p. 1101, quoting *People v. Farnam* (2002) 28 Cal.4th 107, 135 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

As a preliminary matter, defendant contends that because the trial court did not articulate the standard it used to determine whether he established a prima facie discrimination case, we must presume it used the then current "strong likelihood" standard. Defendant asserts that this standard sets a higher threshold than the *Batson* standard of an "inference" of group bias. Defendant also claims that because the trial court used the incorrect standard, its

ruling is entitled to no deference.[15] But as we have held in analyzing *Batson/Wheeler* claims, "[r]egardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in *Johnson* . . . [we] are able to apply the high court's standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*Cornwell, supra,* 37 Cal.4th at p. 73, italics omitted; *Guerra, supra,* 37 Cal.4th at p. 1101.)

As to the three challenged jurors, defense trial counsel sought to establish a prima facie case of discrimination solely on the circumstance that the prosecutor struck three individuals of Hispanic ancestry, and that defendant was of the same ancestry. On appeal, defendant contends that a prima facie case is established because the prosecutor struck three of the only four Hispanics called to serve on the jury. In the alternative, defendant claims that the fact that all three struck jurors were Hispanic *women* supports a prima facie case of discrimination against Hispanic women as a cognizable class. We will assume, without deciding, that defendant's claim of discrimination as to Hispanic women specifically (as opposed to Hispanics generally) is not forfeited on appeal because he failed to present it below. (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1016, fn. 12 [47 Cal.Rptr.3d 467, 140 P.3d 775] (*Lewis and Oliver*).)

We have held that, although a prosecutor's excusal of all members of a particular group may establish a prima facie discrimination case, especially if the defendant belongs to the same group, this fact alone is not conclusive. (*Guerra, supra,* 37 Cal.4th at pp. 1101–1102; *People v. Crittenden* (1994) 9 Cal.4th 83, 119 [36 Cal.Rptr.2d 474, 885 P.2d 887] (*Crittenden*); but see *Johnson, supra,* 545 U.S. at pp. 166, 173 [the removal of all three African-American prospective jurors established a prima facie case].) The prosecution did not excuse all Hispanic jurors, and defendant is a Hispanic man, not a Hispanic woman. In any event, as discussed below, the record discloses race-neutral grounds for the prosecutor's peremptory challenges. (*Guerra, supra,* 37 Cal.4th at p. 1101.)

---

[15] Defendant also contends that the trial court's ruling deserves no deference because, in the course of discussing the motion, the trial court mentioned that "there were two African-American representatives on the jury." Defendant argues that this demonstrates a misunderstanding of the purpose of *Batson*. We need not reach this issue, because as explained below, our conclusion that defendant did not make a prima facie showing is based on our review of the record, not on deference to the trial court's ruling or reasoning.

### 1. *Prospective Juror M.A.*

During voir dire, Prospective Juror M.A. stated that Spanish was her primary language, and that she did not speak English well or understand many words. She stated she did not have any strong feelings either for or against capital punishment. Defense counsel moved to excuse M.A. for cause because she lacked sufficient skills in both written and spoken English, and because her problems with speaking and understanding English could affect her ability to interact with the other jurors during deliberations. The prosecutor agreed and also requested that she be excused for cause. Trial counsel for Alvarado opposed the for-cause challenge. The trial court denied the challenge, and stated the parties would have to deal with excusing M.A. through a peremptory challenge.

Defendant contends that because the trial court denied the challenge for cause based on M.A.'s limited English language skills, this ground is not a valid basis for a peremptory challenge either. But the circumstance that a juror is not subject to exclusion for cause does not, on its own, support an inference that group bias motivated the peremptory challenge. (*Cornwell*, *supra*, 37 Cal.4th at p. 70.) The record demonstrates both the prosecutor and defendant's own counsel were reasonably concerned about the prospective juror's English language skills and, on this basis, the prosecutor was entitled to excuse her.

### 2. *Prospective Juror L.H.*

During voir dire, Prospective Juror L.H. stated she tended to favor life imprisonment, rather than the death penalty, as the appropriate punishment. She observed that she could keep an open mind, but would have to be "really convinced" before returning a death verdict. Although the trial court had explained at some length that neither side bore a burden of proof in the penalty phase, when asked by the prosecutor if she would place a burden of proof on either party regarding the appropriate punishment, she responded, "Prosecution."

At best, L.H. appeared equivocal about the death penalty, and at worst, she appeared biased against it. Defendant claims that although she stated during voir dire that she would lean toward imposing life imprisonment, she also said she could keep an open mind. That a juror is equivocal about his or her ability to impose the death penalty is relevant to a challenge for cause, but does not undercut the race-neutral basis for a prosecutor's decision to excuse a prospective juror peremptorily. (*People v. Catlin* (2001) 26 Cal.4th 81, 118 [109 Cal.Rptr.2d 31, 26 P.3d 357].) The record strongly suggests the prosecutor had grounds for concern about her possible bias against the death penalty, and on this basis was entitled to excuse her.

### 3. *Prospective Juror Y.M.*

During the court's voir dire, Prospective Juror Y.M. stated she had strong religious beliefs against the death penalty and she could not return a death sentence. During the prosecution's voir dire, she again expressed religious reservations against the death penalty, but asserted she could sit as a juror in this case. The trial court denied the prosecutor's for-cause challenge of Y.M., but allowed the prosecutor to exercise a peremptory challenge against Y.M. after finding that Y.M. had strong feelings against the death penalty. The record suggests the prosecutor had reason for concern about Y.M.'s possible bias against the death penalty, and on this basis, he was entitled to excuse her.

### 4. *Group Attitude*

In addition, defendant claims that, even if Prospective Jurors L.H. and Y.M. exhibited a bias against the death penalty, most Hispanic women actually feel this way, so that any disqualification of a Hispanic woman based on her beliefs about the death penalty would constitute improper bias against this group. We note that defendant points to no evidence in the record to support his speculation about Hispanic women's beliefs. In any event, we have recently rejected a similar contention. (*Lewis and Oliver, supra,* 39 Cal.4th at p. 1016.) A prosecutor may excuse prospective jurors, including members of cognizable groups, based on personal, individual biases those prospective jurors *actually* express, even if the biased view or attitude may be more widely held inside the cognizable group than outside of it. (*Ibid.*)

### C. *Asserted* Witt/Witherspoon *Error*

Defendant contends the trial court erred in not excusing for cause five prospective jurors who were biased in favor of the death penalty, and in excusing for cause two prospective jurors he asserts were not biased, in violation of *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] and *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. Defendant claims the trial court's rulings violated his right to trial by a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. For the reasons discussed below, we conclude that the trial court did not err in its rulings concerning the for-cause challenges of prospective jurors, and that defendant's constitutional rights were not violated.

## 1. *Denial of Defense's For-cause Challenges*

The defense unsuccessfully challenged for cause the following five prospective jurors: R.L., P.G., S.K., M.N., and D.V.[16] The defense later removed Prospective Juror R.L. using a peremptory challenge. Prospective Jurors P.G. and S.K. were chosen to sit as jurors.

Preliminarily, the People contend that defendant has forfeited these claims because his trial counsel did not exhaust his peremptory challenges.[17] " 'To preserve a claim of trial court error in failing to remove a juror for bias in favor of the death penalty, a defendant must either exhaust all peremptory challenges and express dissatisfaction with the jury ultimately selected or justify the failure to do so.' " (*Guerra, supra,* 37 Cal.4th at p. 1099, quoting *People v. Williams* (1997) 16 Cal.4th 635, 667 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Defendant does not dispute the fact that his trial counsel neither exhausted his peremptory challenges nor expressed dissatisfaction with the jury ultimately selected. Rather, he asserts that our discussion in *People v. Johnson, supra,* 47 Cal.3d at pages 1220–1221, concerning the dynamic nature of the process of exercising peremptory challenges, somehow undermines the exhaustion requirement. Defendant is mistaken. Our discussion in *Johnson* addresses how a party with fewer remaining peremptory challenges might exercise them more sparingly, but this does not relieve defendant of the exhaustion requirement in order to preserve his claim. Alternatively, defendant seeks to justify trial counsel's failure to exhaust all peremptory challenges by arguing that when counsel accepted the 12 jurors in the box, the venire contained several prospective jurors who may well have been worse than those in the box. Even assuming this argument could justify a failure to exhaust his peremptory challenges, it is mere speculation on this record. Defendant's contentions of erroneous jury inclusion are therefore forfeited.

Even if he did not forfeit his claims, defendant can show no error with respect to the three prospective jurors who did not sit on the jury, that

---

[16] For R.L., S.K., M.N. and D.V., both defendant's trial counsel and Alvarado's trial counsel joined in the for-cause challenges. For P.G., Alvarado's trial counsel made a challenge for cause, but defendant's trial counsel stated he was not challenging P.G. for cause. We do not consider the claim as to P.G. forfeited, however, because failure to object does not forfeit a *Witt/Witherspoon* claim on appeal. (*People v. Schmeck* (2005) 37 Cal.4th 240, 262 [33 Cal.Rptr.3d 397, 118 P.3d 451] (*Schmeck*); *People v. Velasquez* (1980) 26 Cal.3d 425, 443 [162 Cal.Rptr. 306, 606 P.2d 341].) In addition, codefense counsel's challenge for cause alerted the trial judge to the possibility of *Witt/Witherspoon* error as to P.G. (See *People v. Velasquez, supra,* 26 Cal.3d at p. 444.)

[17] The defense exercised five of 20 available joint peremptory challenges only, and defendant did not exercise any of his five individual peremptory challenges.

is, R.L., M.N., and D.V.[18] As to the two jurors who did sit on the jury, P.G. and S.K., as discussed below, the trial court properly denied each of defendant's challenges for cause.

 The same analysis applies to claims involving erroneous juror exclusion or inclusion. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519].) " 'Applying *Wainwright v. Witt, supra*, 469 U.S. 412, 424 . . . , we have stated that " '[i]n a capital case, a prospective juror may be excluded if the juror's views on capital punishment would "prevent or substantially impair" the performance of the juror's duties.' [Citations.] 'A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" . . . In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' " (*Blair, supra*, 36 Cal.4th at p. 743, quoting *People v. Jenkins* (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

### a. *Juror P.G.*

During the trial court's voir dire, P.G. stated he would be able to follow the law and procedures in capital cases. He did not believe his feelings either for or against the death penalty would affect his judgment. P.G. told defense counsel he thought the state should reserve the death penalty for the most brutal and severe crimes, but he did not have a specific list of such crimes in mind. P.G. stated that if he found the torture allegation in the conspiracy count to be true, he could impose the death penalty and he would place the burden on the defense in the penalty phase to produce evidence to get him to lean the other way. But in response to the prosecutor's questions, P.G. said he would consider the factors the trial court read when making his determination about the appropriate punishment, and he was not predisposed in the death penalty's favor based on the charges filed against the defendants. The record supports the trial court's conclusion that P.G. did not hold views that would

---

[18] "To establish that the erroneous inclusion of a juror violated a defendant's right to a fair and impartial jury, the defendant must show either that a biased juror actually sat on the jury that imposed the death sentence, or that the defendant was deprived of a peremptory challenge that he or she would have used to excuse a juror who in the end participated in deciding the case." (*People v. Blair* (2005) 36 Cal.4th 686, 742 [31 Cal.Rptr.3d 485, 115 P.3d 1145] (*Blair*), italics omitted.) The defense removed R.L. with a peremptory challenge, but defendant makes no argument that exercising a peremptory challenge on R.L. deprived him of one that he would have used to excuse a juror who participated in deciding the case (and indeed he cannot make such an argument, given the number of his remaining unused peremptory challenges). M.N. and D.V. never even made it into the jury box.

prevent or substantially impair the performance of his duties as a juror. (*Blair, supra*, 36 Cal.4th at p. 743.)

### b. *Juror S.K.*

In his responses to the written questionnaire, S.K. indicated he thought there were circumstances, such as a planned murder, where a defendant should receive the death penalty automatically. During voir dire, S.K. confirmed his responses to the questionnaire but acknowledged he made them before the court instructed him about the two options in the penalty phase. S.K. noted that he could separate his personal beliefs and his ability to consider both sentencing options. He stated he would follow the court's penalty instructions, and that he would consider the alternative penalty of life without the possibility of parole. S.K. responded to defense counsel that he understood the trial court's instruction that the law did not have a preference for the death penalty and that its imposition was not automatic. He also stated he would make his decision on penalty after listening to both sides.

Although the trial court concluded that S.K. gave equivocal answers, the court was satisfied that S.K. was capable of fulfilling his juror responsibilities. The record supports the trial court's conclusion that S.K. did not hold views that would prevent or substantially impair the performance of his duties as a juror. (*Blair, supra*, 36 Cal.4th at p. 743.)

### 2. *Granting of Prosecution's For-cause Challenges*

Defendant asserts the trial court erred in excusing two prospective jurors, R.J., and R.A. for their alleged bias against the death penalty. We discuss each claim below.

### a. *Prospective Juror R.J.*

In his written questionnaire, R.J. noted that he was ambivalent about the death penalty, but denied having conscientious or other objections to it, and indicated he would not automatically vote for life imprisonment. In his voir dire examination, however, R.J. stated he was biased against the death penalty and would not be able to listen to all the evidence in the penalty phase with an open mind and return a verdict of death. The trial court granted the prosecutor's for-cause challenge to R.J., concluding his ability to sit as a fair and impartial juror was substantially impaired due to his strong beliefs in opposition to the death penalty. The record supports the trial court's conclusion that R.J. held views that would prevent or substantially impair the performance of his duties as a juror. (*Schmeck, supra*, 37 Cal.4th at p. 262.)

Even if his statements are considered conflicting or equivocal, the trial court's determination of each juror's true state of mind is binding on us. (*Ibid.*)

### b. *Prospective Juror R.A.*

In his written questionnaire, R.A. expressed equivocal views about the death penalty. During the trial court's voir dire, R.A. stated that his feelings in opposition to capital punishment would not affect his judgment, and that he was capable of keeping an open mind in order to impose a just punishment. But during defense counsel's questioning, R.A. observed that he did not think he was ready to pass judgment in a capital case. In response to the prosecutor's voir dire, R.A. stated he would not impose the death penalty on a first time murderer with special circumstances. He did observe that if a murderer were to kill again after having been given a chance to rehabilitate, the death penalty might be appropriate.

The prosecutor challenged R.A. for cause because he apparently would not impose death on first-time murderers. The court granted the prosecutor's challenge. We find that the record supports the court's conclusion that R.A.'s views would prevent or substantially impair his ability to perform his juror duties. (*Schmeck, supra,* 37 Cal.4th at p. 262.)

### D. *Denial of Motion to Admonish Prospective Jurors*

Defendant contends the trial court erred when it denied his motion in limine requesting the court to admonish prospective jurors of their civic duty to serve as jurors, and to set aside their personal views as to that duty in order to follow the law. Defendant claims the trial court's denial of his motion contributed to the improper dismissal of qualified jurors, and violated his right to an impartial jury, due process, and equal protection of the laws under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He further claims the trial court erred by excusing prospective jurors for cause without first so admonishing them.[19] Defendant concedes that we have consistently held "a 'civic duty' admonition is not necessary," and apparently

---

[19] Defendant argues a "civic duty" admonition might have "salvaged" six prospective jurors excused for cause: R.J., L.S., N.W., P.K., A.U., and R.A. As an initial matter, we note that the goal of voir dire is not to "salvage" problematic jurors, but rather to find 12 fair-minded jurors who will impartially evaluate the case. In the previous section, defendant claimed that two of these six prospective jurors (R.J. and R.A.) were excused in violation of *Witherspoon* and *Witt.* But defendant does not appear to claim that the remaining four jurors (L.S., N.W., P.K., and A.U.) were also excused in violation of *Witherspoon* and *Witt.* In any event, we have reviewed the voir dire of these other four jurors, and we conclude the record supports the trial court's findings that these jurors held views that would prevent or substantially impair the performance of their duties.

asks us to reconsider the issue. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1261 [270 Cal.Rptr. 451, 792 P.2d 251].) We decline to do so and find no error under these facts.

## IV. GUILT PHASE ISSUES

### A. *Alleged Errors in Admitting Crime Scene and Autopsy Photographs*

Defendant contends that the trial court erred when it admitted crime scene and autopsy photographs, and in so doing violated his constitutional rights to a fair trial, due process of law, and a reliable sentence. Having viewed the photographs, and for the reasons discussed below, we conclude the court neither abused its discretion nor violated defendant's constitutional rights in admitting the photographs.

Alvarado filed in limine motions, in which defendant joined, to exclude crime scene and victim autopsy photographs as irrelevant, cumulative, and more prejudicial than probative. At a pretrial hearing, the trial court examined the photographs, and admitted some while excluding others. Defendant apparently challenges all of the photographs admitted over defense objection, and claims they were not relevant or, in the alternative, that they were cumulative and inflammatory. (Evid. Code, § 352.)

In determining whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant under Evidence Code section 210, and (2) if they were relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (*People v. Carter* (2005) 36 Cal.4th 1114, 1166 [32 Cal.Rptr.3d 759, 117 P.3d 476].) Defendant presents no credible argument that the photographs were irrelevant. The photos were clearly relevant to the determination of many disputed facts in this case including how the victims were killed and what happened prior to the killings. (Evid. Code, § 210.)

■■■ Nor did the trial court abuse its discretion in determining that the probative value of each photograph was not substantially outweighed by its prejudicial effect. " 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 453–454 [46 Cal.Rptr.3d 677], quoting

*Crittenden, supra,* 9 Cal.4th at pp. 133–134.) We have examined the photographs and conclude they are not of such a nature as to overcome the jury's rationality. (*People v. Gurule* (2002) 28 Cal.4th 557, 625 [123 Cal.Rptr.2d 345, 51 P.3d 224].) The trial court did not err in admitting the challenged photographs of the victims, nor did their admission violate defendant's constitutional rights.

 B. *Asserted Error in Admission of Testimony of Prosecution's Blood Spatter Expert Witness*

Defendant contends that prosecution blood spatter expert witness, Deputy Sheriff Brian Kennedy, was biased and lacked proper qualification as an expert. He claims Kennedy's testimony (on crime reconstruction using blood spatter analysis) violated defendant's constitutional rights to a fair trial, due process of law, and a reliable penalty determination. The testimony described the blood spatter patterns the killings caused, other transfers of blood (including "castoffs," "wipes," and drip trails), and blood pooling in Daniel Magoon's body. Defendant further contends the court violated Evidence Code section 402 and his federal due process rights when it deferred, until midtrial, any rulings on the admissibility of Kennedy's testimony. For the reasons discussed below, we conclude no error occurred.

The parties discussed the admissibility of Kennedy's testimony during in limine motions. Defense counsel made an oral objection to the testimony under *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, raising the issue of whether Kennedy had used correct procedures.[20] The court ruled that *Kelly* was inapplicable to Kennedy's testimony. After reviewing Kennedy's résumé, the trial court stated that there was no need to have an Evidence Code section 402 hearing on Kennedy's qualifications, because Kennedy appeared qualified. The trial court noted that the defense would have the opportunity to voir dire Kennedy at trial to confirm his qualifications. At trial, defense counsel did not object to Kennedy's testimony.

As a preliminary matter, the People assert that defendant forfeited his claims because he failed to object to Kennedy's testimony either on the ground that he was biased or that he lacked proper qualifications as an expert. Defendant replies that trial counsel's objection on *Kelly* and *Frye* grounds to the scientific validity of the procedures followed by Kennedy is sufficient to

---

[20] Because the United States Supreme Court abrogated the *Frye* formulation in federal trials in 1993, this rule should more accurately be referred to now as the *Kelly* rule. (See *People v. Leahy* (1994) 8 Cal.4th 587, 591 [34 Cal.Rptr.2d 663, 882 P.2d 321].)

preserve the issue on appeal.[21] But because the objection below neither explicitly nor implicitly raised the issues of Kennedy's bias or lack of qualification, we conclude that defendant did forfeit the claims. (*People v. Jenkins, supra,* 22 Cal.4th 900, 1000.)

Even assuming that defendant's claims were not forfeited, we find them without merit. A claim that expert opinion evidence has been improperly admitted is reviewed under the deferential abuse of discretion standard. (*People v. Panah* (2005) 35 Cal.4th 395, 478 [25 Cal.Rptr.3d 672, 107 P.3d 790].) "Error regarding a witness's qualifications as an expert will be found only if the evidence shows that the witness ' " '*clearly lacks* qualification as an expert.' " ' [Citation.]" (*People v. Farnam, supra,* 28 Cal.4th at p. 162.) The record does not show that Kennedy lacked expert qualifications. Kennedy received a bachelor's degree in police science and management and after becoming a police officer took supplemental courses in crime scene reconstruction and bloodstain patterns. He lectured on blood spatter evidence at an in-service school for criminal investigators and prosecutors at San Jose State University. He had testified regarding blood spatter evidence in superior courts throughout the state on numerous occasions. He conducted blood spatter analysis for the Sacramento County Sheriff's Department and went to homicide scenes. Kennedy's educational background and work experience fully qualified him to testify as an expert on blood spatter evidence. (See *People v. Combs* (2004) 34 Cal.4th 821, 849 [22 Cal.Rptr.3d 61, 101 P.3d 1007].)

Defendant contends that Kennedy was biased because his report included a section called "The Bludgeoning," in which he opined that the eight cast-off bloodstains in the hallway were likely caused by repeated blows to Mary Magoon's head by an instrument consistent with a nine-millimeter handgun. The serology reports, however, showed that the blood at issue was not Mary Magoon's; it was D.'s.[22] Defendant implies this discrepancy shows Kennedy's bias against the defendant in the face of scientific evidence to the contrary. But the explanation for the apparent conflict, as Kennedy testified at trial, was that his deadline for submitting the findings to the district attorney's office required him to write his report before the serology tests had been completed, and he was asked to outline as many possibilities as he could, including the possibility that the blood in the hallway was Mary Magoon's. After the serology tests were returned, and prior to trial, Kennedy sought to redact the pages of the report that dealt with the bludgeoning in the hallway,

---

[21] Defendant appears to refer to the *Kelly/Frye* objection below to support his contention that Kennedy lacked proper expert qualification and was biased in the prosecution's favor. He does not raise a *Kelly* rule issue on appeal. A *Kelly* rule claim would be unavailing in any case, as we have held that *Kelly* is inapplicable to blood spatter testing. (*People v. Clark* (1993) 5 Cal.4th 950, 1018 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

[22] D. was not injured during the murders. His cast-off bloodstains in the hallway apparently predated the murders.

but the trial court ruled that Kennedy's entire report was the fair subject of defense examination. Nothing in this record suggests Kennedy was biased in any regard.

In addition, we find no merit in defendant's contention that the trial court violated Evidence Code section 402 and defendant's due process rights when it deferred until midtrial any rulings on the admissibility of Kennedy's testimony. The trial court did not defer its Evidence Code section 402 rulings until midtrial; it made pretrial rulings on the two preliminary facts raised, which were the scientific reliability of blood spatter testing (the *Kelly* rule objection), and Kennedy's qualifications to testify as an expert witness.[23]

Defendant contends the court should have held an evidentiary hearing before Kennedy was allowed to testify. The claim has no merit. Kennedy's resume sufficiently established his qualifications. In addition, the court correctly concluded that blood spatter testing does not require *Kelly* scrutiny. (*People v. Clark, supra,* 5 Cal.4th at p. 1018.) We therefore conclude no error occurred when the court admitted Kennedy's expert testimony.

### C. Asserted Errors in Rulings on Admissibility of Evidence of Mary Magoon's Alleged Propensity for Violence and Use of Firearms

Defendant contends that the court abused its discretion in excluding evidence of Mary Magoon's alleged propensity for violence and use of firearms. Defendant claims the exclusion violated his rights to due process, to present a defense, and to a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. As discussed below, defense counsel did not seek to admit this evidence, and, even if he had, it would not have been an abuse of discretion for the trial court to have excluded the evidence.

Before trial commenced, the court denied the prosecution's motion in limine to exclude, as irrelevant, evidence of Daniel Magoon's propensity for violence and prior firearm use. The court agreed with defense counsel that the presence of the Ingram "Mac-10" style semiautomatic pistol at the entryway of the Magoon house supported the defense theory that Daniel Magoon may have brandished that weapon in a confrontation with defendants, and that his propensity for violence and prior use of firearms was therefore relevant. But the parties did not discuss the relevance of evidence pointing to *Mary Magoon's* propensity for violence or prior firearm use.

---

[23] Evidence Code section 400 et seq. sets forth rules for determining the existence or nonexistence of a preliminary fact "[w]hen the existence of a preliminary fact is disputed . . . ." (Evid. Code, § 402, subd. (a).) A " 'preliminary fact' means a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence." (Evid. Code, § 400.)

During the cross-examination of prosecution witness Jimmy Johnson, defense counsel asked Johnson about statements Johnson made to the police concerning Mary Magoon's propensity for violence and prior firearm use. The prosecution objected to the question on relevance grounds, but the court overruled the objection. Later, outside the presence of the jury, defense counsel told the court that Johnson had made a prior statement to police that Johnson believed Mary Magoon was heading to the bathroom to get a gun before she was murdered. The court did not rule that the statement was inadmissible. Instead, it observed that the evidence presented at trial thus far provided no foundation for questions concerning Mary Magoon's propensity for violence and firearm use. Continuing his cross-examination of Johnson, defense counsel asked about a statement that Johnson had made to the police that Mary Magoon "was on a runaway . . . train with Dan." The court sustained the prosecution's objection on relevance grounds.

The issue of Mary Magoon's propensity for violence resurfaced later in the trial, when defense counsel asked the court to rule on defendant's pending motion in limine to admit the testimony of Detective Coleman. That testimony would discuss Daniel Magoon's 1982 arrest in order to show his propensity for being armed during drug transactions. The court was concerned that because Mary Magoon had also been present at the arrest, the testimony could confuse the issues under Evidence Code section 352, particularly because there was no evidence establishing Mary Magoon's propensity for violence. Defense counsel made a narrower offer of proof limited to Daniel Magoon's past gun use, and stated he was willing to sacrifice any testimony about Mary Magoon in order to present the jury with the evidence concerning Daniel Magoon. In light of the narrowed offer of proof, the court admitted Detective Cole's testimony, and defendant's counsel did not object to the ruling.

Although the record shows that defense counsel failed to seek a ruling on the admissibility of evidence concerning Mary Magoon's propensity for violence and prior use of firearms, defendant contends that any further attempts by trial counsel to admit such evidence would have been futile after the court appeared to indicate that it believed such evidence to be inadmissible. Even assuming defendant's argument to be true, the trial court would not have abused its discretion in excluding such evidence under Evidence Code section 352 on the ground that it would have created a substantial danger of confusing the issues at trial. (See *People v. Wright* (1985) 39 Cal.3d 576, 587–588 [217 Cal.Rptr. 212, 703 P.2d 1106] [court may exclude under Evid. Code, § 352 evidence of the aggressive and violent character of the victim].) During the pretrial discussions of the relevance of admitting evidence of Daniel Magoon's propensity for violence and gun use, the trial court pointed out that, in order for a murder victim's propensity for violence to be relevant, there must be some evidentiary support for a self-defense-type

theory that the defendant perceived the murder victim as presenting an immediate threat. As the trial court noted, even if the murder victim were the most violent person in the world, that fact would not be relevant if the evidence made it clear that the victim was taken by surprise and shot in the back of the head.

There was no evidence indicating that Mary Magoon could have presented a threat to defendant. Mary Magoon was killed in the hallway bathroom, which was a significant distance away from the living room, where investigators found the two rifles, or the entryway, where investigators found the Ingram "Mac-10" style semiautomatic pistol. The evidence indicated that she had been shot while holding three-year-old J. in her arms, beaten, and then finished off with a bullet to the back of her head. Defendant's sole basis for arguing that Mary Magoon might have been perceived as a threat to defendant is Johnson's statement to the police that Mary Magoon might have been going for a gun in the hallway bathroom, which was sheer speculation.[24] Given this record, it would have been within the trial court's discretion to have excluded the admission of evidence pertaining to Mary Magoon's alleged propensity for violence and prior use of firearms.

### D. *Asserted Error in Refusal to Instruct on Voluntary Manslaughter as to Mary Magoon*

Defendant contends the trial court erred in refusing to instruct the jury on the voluntary manslaughter of Mary Magoon as a lesser included offense of murder, on the theory that her killing was committed either in sudden quarrel/heat of passion or in unreasonable self-defense. Defendant claims the court's failure to so instruct deprived him of his due process right to have the jury determine every material issue the evidence presented. Defendant again points to Mary Magoon's alleged propensity for violence and claims that her alleged role in the family business may have led defendant to believe she was "going for a weapon in the bathroom when killed." Defendant asserts that this evidence "supports a voluntary manslaughter instruction because it was sufficient to deserve consideration by the jury, and a reasonable jury could find it sufficiently persuasive to warrant a verdict of voluntary manslaughter."

■ We disagree. " 'Manslaughter is "the unlawful killing of a human being without malice." ' [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 102 [24 Cal.Rptr.3d 507, 105 P.3d 1099], quoting § 192.) Even though a

[24] Defendant asserts that Mary Magoon "was found on the floor near the empty box of a weapon just like the one she was known to have carried in the past." But defendant is mistaken. The empty gun box of the Helwan pistol was found in a hidden compartment in the *master bedroom bathroom*, not in the *hallway bathroom* where investigators found Mary Magoon's body.

court must instruct on general principles of law relevant to the issues the evidence raises, "[a] court is not obligated to instruct sua sponte on voluntary manslaughter as a lesser included offense in the absence of substantial evidence that the defendant acted in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or that the defendant killed in ' " 'unreasonable self-defense.' " ' [Citation.]" (*Benavides,* at p. 102.) There was no evidence that the killing of Mary Magoon involved sudden quarrel/heat of passion or unreasonable self-defense, and therefore no support for a voluntary manslaughter instruction.

### E. Asserted Errors Arising Out of Lack of Instruction on the Elements of Torture

Defendant contends the court violated his rights to due process, a fair trial, and a reliable sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the prosecution misused the law related to conspiracy, and effectively charged defendant with murder by torture, when it listed the torture of Mary Magoon as one of 10 overt acts in the conspiracy to commit robbery count (a noncapital offense for which defendant and Alvarado were charged and found guilty). Defendant further contends that the prosecutor's references to torture during the trial had the effect of trying defendant for murder by torture, even though neither codefendant was so charged, and the trial court did not instruct the jury in any definition of torture. Defendant does not specify whether the asserted error is based on prosecutorial misconduct in using the word "torture" or the trial court's failure to instruct the jury in the legal elements of torture, but we discern no error under either theory. Defense counsel never objected to the prosecution's use of the word "torture" in the information or at trial. For this reason, we consider any claim based on the prosecution's use of the word "torture" forfeited. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1000.) In addition, as we explain, even if defendant did not forfeit the issue, he fails to show prejudice.

#### 1. Torture as an Overt Act

Count 1 of the information charged both codefendants with conspiracy to commit robbery. It listed 10 overt acts: (1) arming themselves with nine-millimeter pistols; (2, 3) driving to Daniel Magoon's residence and entering it; (4) shooting and murdering Daniel Magoon; (5) torturing Mary Magoon; (6) shooting and murdering Mary Magoon; (7) shooting and wounding J.; (8–10) stealing Daniel Magoon's marijuana, nine-millimeter Helwan pistol, and money. The information charged murder generally, and did not specify first degree murder by torture under section 189. Defendants were not charged with the crime of torture under section 206, nor was torture alleged as a special circumstance under section 190.2, subdivision (a)(18). The

prosecution submitted but, on defense counsel's objection, withdrew a first degree murder by torture instruction. The court did not instruct the jury on any torture definition.

■ For the conspiracy count, defendant cites no authority holding the trial court was required to instruct the jury on the meaning of the word "torture," as an overt act. "A court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language, but it does have a duty to define terms that have a technical meaning peculiar to the law." (*People v. Bland* (2002) 28 Cal.4th 313, 334 [121 Cal.Rptr.2d 546, 48 P.3d 1107].) In the information, the word "torture" was used in its commonly understood sense to describe an overt act, not as part of a legal definition of conspiracy. ■ Overt acts are not required to be crimes. (*People v. Marquez* (1994) 28 Cal.App.4th 1315, 1325–1326 [33 Cal.Rptr.2d 821].) Because there is no indication the word "torture" was being used in a technical legal sense, the trial court had no sua sponte duty to define the term in the conspiracy count.

Even assuming the trial court erred in not instructing on the meaning of the word "torture" as an overt act, any error was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] [federal constitutional error assessed under harmless beyond a reasonable doubt standard]; *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243] [state law error assessed under reasonable probability standard]; *People v. Flood* (1998) 18 Cal.4th 470, 490, 502–504 [76 Cal.Rptr.2d 180, 957 P.2d 869] [instructional error subject to harmless error review].) Substantial evidence supported the other nine overt acts, any one of which also supported the jury's guilty verdict on the conspiracy count. (*People v. Russo* (2001) 25 Cal.4th 1124, 1128 [108 Cal.Rptr.2d 436, 25 P.3d 641] [jury need not unanimously agree on the same overt act to convict for conspiracy].)

## 2. *First Degree Murder by Torture*

■ Defendant contends the court should have instructed the jury on the legal elements of torture. But because defendant was not charged with the separate crime of torture under section 206, or torture as a special circumstance under section 190.2, subdivision (a)(18), the trial court had no duty to instruct on either. Murder by torture is a specified statutory basis for first degree murder. (§ 189.) The information charging defendant with murder did not specify first degree murder by torture, but the accusatory pleading need not specify the theory of first degree murder on which the prosecution intends to rely. (See *People v. Diaz* (1992) 3 Cal.4th 495, 556–557 [11 Cal.Rptr.2d 353, 834 P.2d 1171] [information need not specify first degree murder by poison].) Of course, even though the prosecutor did not charge first degree

murder by torture, he still might have presented the elements of murder by torture to the jury in the course of presenting his case. But even assuming the prosecutor, in effect, developed a murder by torture theory at trial and even assuming the trial court had a duty to instruct on first degree murder by torture, defendant can show no possible prejudice from the absence of the instruction. The jury was instructed on two theories supporting a guilty verdict for first degree murder: premeditation and felony murder. The jury found defendant guilty of first degree murder as to Mary Magoon based on either or both of those theories. There was no possible prejudice to defendant by the trial court's failure to provide the jury with a *third* theory for returning a verdict of first degree murder. Whether the jury accepted or rejected this third theory would not have changed the verdict of first degree murder it returned based on the other two theories.

### F. *Asserted Errors Arising from Prosecutor's Late Disclosure of Report on Informant George Jimenez*

The jury returned its verdicts in the guilt phase on March 7, 1994. The next day, the prosecutor sent defense counsel a copy of a one-page report dated March 7, 1994, prepared by the prosecutor's investigator, David Weil, which described statements Jimenez had made to Weil on September 22, 1993, when Weil served a subpoena on Jimenez. Weil's report appeared to undermine the credibility of Jimenez as a potential witness because it noted that Jimenez said his statements to the police about Alvarado's admissions in jail could have been untrue because of drugs Jimenez was taking at the time.[25] As discussed above in part II.C., the trial court had excluded Jimenez's statements from the prosecution's case-in-chief on *Aranda* and *Bruton* grounds, but Jimenez's statements were held admissible for impeachment if Alvarado testified. Neither Alvarado nor Jimenez testified at trial.

Both defendant and Alvarado filed written motions seeking a new trial and other relief. They complained that the prosecutor's failure to disclose information affecting Jimenez's credibility violated *Brady*, *supra*, 373 U.S. at page 87. Defendant's motion included the declaration of his cocounsel, Arturo Herrera, stating that defendant had consistently expressed a desire to testify in his own defense, and that Attorney Herrera had advised defendant against testifying because Alvarado was not going to testify.

---

[25] Weil's report stated in relevant part: "Jimenez said that he did not want to testify in this matter because he was afraid. He went on to say that he does not remember most of what he told the officers and that he (Jimenez) was taking strong medication at the time he talked to the authorities. Jimenez made it known to me that his statement that was recorded earlier could be misleading or contain falsehoods because of the drugs he was taking at the time." Jimenez also said "he was concerned for his safety and the safety of his family if he was compelled to testify."

The trial court granted Alvarado's motion for a new trial, reasoning that Jimenez's statements to Weil constituted *Brady* material that the prosecution was obligated to disclose to Alvarado, and that the prosecutor's failure to provide this information at a critical stage in the proceedings prevented Alvarado's counsel from providing effective representation on the question of whether to testify.[26] (*Brady, supra,* 373 U.S. at p. 87.) The trial court denied defendant's motion in all respects.

Defendant contends the trial court erred in denying his motion for a new trial because the late disclosure of the Weil report violated his right to due process under *Brady* and his right to the effective assistance of counsel. Defendant claims these constitutional violations rendered his trial fundamentally unfair and require the court to set aside his verdicts. For the reasons discussed below, we conclude defendant's constitutional rights were not violated, and the trial court did not err in denying defendant's motion for a new trial.[27]

### 1. Brady v. Maryland

#### a. *The* Brady *Standard*

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady, supra,* 373 U.S. at p. 87.) The high court has extended the prosecutor's duty to encompass the disclosure of material evidence, even if the defense made no request concerning the evidence. (*United States v. Agurs* (1976) 427 U.S. 97, 107 [49 L.Ed.2d 342, 96 S.Ct. 2392].) The duty encompasses impeachment evidence as well as exculpatory evidence. (*United States v. Bagley* (1985) 473 U.S. 667, 676 [87 L.Ed.2d 481, 105 S.Ct. 3375].) Such evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would

---

[26] In granting Alvarado's motion, the trial judge also mentioned that Alvarado's counsel had subpoenaed the sheriff's office for Jimenez's psychiatric and medical record, but had not received them even though Alvarado's counsel had a right to receive that information.

[27] Defendant's motion for a new trial was based on the constitutional grounds of an asserted *Brady* violation or violation of the right to the effective assistance of counsel. On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 127.) Its ruling will not be disturbed unless defendant establishes "a 'manifest and unmistakable abuse of discretion.' " (*Ibid.,* quoting *People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) Here, the asserted abuse of discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights. Our constitutional analysis below therefore also addresses the abuse of discretion issue.

have been different." "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 682.) " '[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.' " (*In re Brown* (1998) 17 Cal.4th 873, 887 [72 Cal.Rptr.2d 698, 952 P.2d 715], quoting *Bagley, supra,* 473 U.S. at p. 683.) Defendant has the burden of showing materiality. (*In re Sassounian* (1995) 9 Cal.4th 535, 545 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

### b. *Defendant's* Brady *Claim*

■ Defendant essentially asserts the *Brady* violation that led the court to grant Alvarado's new trial motion had a spillover effect as to him because he and Alvarado had a strategic understanding that if one defendant testified, the other defendant would also have to testify. Defendant contends the timely disclosure of the Weil report would have led him to testify due to a change in this joint defense strategy.

As the trial court acknowledged during the hearing on the new trial motions, *Brady* claims typically require showing the different result of the proceeding in terms of the *verdict*, rather than in terms of an intermediate event such as a defendant's testifying. Defendant essentially ignores the issue of how his testimony would have changed the verdict. If, however, defendant cannot establish the materiality of the Weil report even as to the intermediate event of his decision whether to testify, then he has failed to establish the verdict would have been different. As discussed below, we conclude defendant has failed to establish materiality even as to his decision whether to testify.

### c. *Inadmissibility of the Jimenez Statements*

Assuming defendant's claim is cognizable under *Brady*, the People pose a further threshold issue in observing that evidence inadmissible at trial is immaterial under *Brady* and, therefore, the failure to disclose such inadmissible evidence is not a *Brady* violation. Defendant concedes that, at the joint trial, Alvarado's purported admissions would have been admissible against Alvarado but inadmissible as hearsay against defendant, and that if defendant's motion for severance had been granted, the Jimenez testimony could not have been admitted at his single trial for any purpose. Defendant claims, however, that even though the Jimenez testimony was not admissible against defendant individually, his due process claim must survive.

The United States Supreme Court has never announced a bright-line rule that only admissible evidence is "material" for purposes of a *Brady* violation.[28] Some federal and state courts, however, have held that unless the undisclosed evidence would have been admissible at trial, it need not have been disclosed under *Brady*.[29] Other courts have rejected admissibility as a prerequisite for determining *Brady*'s applicability, as long as the information would have led to admissible evidence or been useful to the defense in structuring its case.[30] This court has not directly addressed the issue, although we have implied in dicta that admissibility might be a prerequisite to materiality.[31] In addition, this case presents the additional question of what *aspect* of admissibility is a prerequisite to *Brady* materiality in a joint trial: admissibility at trial generally, or admissibility as to the individual defendant making the *Brady* claim?

Because the evidence on which defendant bases his *Brady* claim was admissible at the joint trial, for the reasons that follow, we conclude defendant may assert a *Brady* claim, even though the evidence was not admissible against him.[32] The *Brady* standard for materiality states the undisclosed evidence is to be evaluated in terms of how "the result of the proceeding would have been different." (*United States v. Bagley, supra,* 473 U.S. at p. 682.) In addition, the evidence's materiality " 'must be evaluated in the context of the entire record.' " (*In re Brown, supra,* 17 Cal.4th at p. 887, quoting *United States v. Agurs, supra,* 427 U.S. at p. 112.) In deciding whether asserted *Brady* evidence is material to defendant's case, it is

---

[28] In *Wood v. Bartholomew* (1995) 516 U.S. 1, 6–7 [133 L.Ed.2d 1, 116 S.Ct. 7], the United States Supreme Court ultimately found inadmissible polygraph evidence not material under *Brady*. However, *Wood* was not based on a per se rejection of inadmissible evidence as a basis for a *Brady* claim. *Wood* found the evidence not material because, even based on the assumption that this inadmissible evidence might have led respondent's counsel to conduct additional discovery leading to admissible evidence, the evidence's influence on the outcome of the case was speculative. (*Wood v. Bartholomew, supra,* 516 U.S. at p. 6; see also *Paradis v. Arave* (9th Cir. 2001) 240 F.3d 1169, 1178 ["In *Bartholomew,* the Court did not categorically reject the suggestion that inadmissible evidence can be material under *Brady,* if it could have led to the discovery of admissible evidence."].)

[29] See, e.g., *Madsen v. Dormire* (8th Cir. 1998) 137 F.3d 602, 604 (inadmissible evidence of forensic chemist's incompetence not material under *Brady*); see also Gershman, Prosecutorial Misconduct (2d ed. 2005) section 5:8, and cases collected therein.

[30] See, e.g., *Paradis v. Arave, supra,* 240 F.3d at page 1179 (prosecutor's notes, although not admissible, could have been used to contradict a key medical witness and nondisclosure was *Brady* violation); see also Gershman, Prosecutorial Misconduct, *supra,* section 5:8, and cases collected therein.

[31] "Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 [29 Cal.Rptr.3d 16, 112 P.3d 14]; cf. *Wood v. Bartholomew, supra,* 516 U.S. at p. 2.)

[32] Thus, we need not and do not reach the issue of whether a *Brady* claim is precluded when the basis of the *Brady* claim is evidence not admissible at trial.

therefore appropriate to examine the effect of the evidence on the actual joint proceeding in which defendant was tried.

### d. *The Joint Defense Strategy*

Even though defendant's *Brady* claim is not per se precluded because the undisclosed evidence was inadmissible against him individually, its inadmissibility highlights the weaknesses in his *Brady* contention. As defendant concedes, Jimenez's statements were admissible only as impeachment evidence against Alvarado, if Alvarado testified. For defendant, unlike Alvarado, there was no direct causal connection between Jimenez's statements and the decision whether or not to testify. If Alvarado testified, Jimenez's statements could have impeached him. But the prosecution could not have impeached defendant with Jimenez's statements, even if Jimenez testified.

Defendant contends Jimenez's statements did affect his decision whether to testify because the potential prejudicial impact of the statements on the jury caused him to adopt a joint defense strategy with Alvarado, to the effect that either both or neither of them would testify. During the hearings on the motions for a new trial, defense counsel extensively discussed the reasoning behind this joint defense strategy, which defendant summarizes and adopts on appeal. If the jury heard Jimenez's statements, their impact would be prejudicial not merely on Alvarado but on defendant as well. Defendant was free to testify without causing Jimenez's statements to be admitted, but if he testified, he presumably would say something exculpatory about his participation in the crime. Then more blame might be placed on Alvarado, so Alvarado would feel compelled to testify. Defendant's and Alvarado's defense counsel believed there was no fair way to have only one story presented. Thus, the codefendants had agreed on a both-or-neither approach to testifying.

### e. *Impact of the Joint Defense Strategy*

Defendant alternatively refers to his understanding with Alvarado on testifying at trial as an agreement and as a trial strategy. To the extent that the defendant implies the existence of a binding agreement, the argument fails. He fails to establish that he formed a binding agreement with Alvarado either by contract or detrimental reliance.[33] The trial court made no findings establishing the existence of a joint defense agreement. To the extent

---

[33] The only factual evidence presented during the new trial motions was the declaration of defendant's trial attorney, Arturo Herrera. His declaration describes defendant's desire to testify and counsel's advice to defendant that, because Alvarado was not going to testify, then neither should he. But this declaration does not assert (let alone establish) the existence of a binding agreement.

defendant's argument for materiality depends on the existence of a binding agreement, defendant has therefore failed to establish one.

In the alternative, defendant describes his agreement with Alvarado as a trial strategy that each codefendant adopted, based on their shared interest in keeping Jimenez's statements away from the jury.[34] Defendant claims that if the prosecution had timely disclosed the Weil report, it would have changed the joint defense strategy because the information revealed in the report would have undercut Jimenez's credibility. He reasons, therefore, that neither he nor Alvarado would have been deterred from testifying because they feared the effect of Jimenez's statements on the jury.

Defendant implies the above trial considerations *necessitated* his adoption of the agreement with Alvarado and corresponding trial strategy. But this strategy was not compelled by necessity, legal or otherwise. Even assuming both codefendants wished to keep Jimenez's statements from the jury, defendant's testifying would not necessarily have caused Alvarado to testify. Alvarado's testifying in response to Jimenez's statements would have been contingent on the nature of defendant's testimony. If defendant's testimony painted Alvarado in a particularly bad light, Alvarado might have testified, in order to shift the blame to defendant.

It was also possible, however, that Alvarado would not have testified. Before testifying, Alvarado would have considered the consequences of his testimony: leaving defendant's testimony unrebutted, or taking the stand and risk having the jury hear Jimenez's statements. Alvarado could not make that calculation prior to hearing defendant's actual testimony. Neither could defendant know with any certainty in advance what Alvarado would do. There was no *necessary* connection between defendant's testifying and Alvarado's testifying.

In observing that defendant has not shown the legal necessity of the purported joint defense strategy, we do not hold defendant is required to show legal necessity in order to establish his *Brady* claim.[35] Nor do we deny defendant presents reasonable strategic considerations that may *possibly* have been factors in his decision whether or not to testify. But codefendants in many joint trials face difficult tactical choices in deciding how to proceed

---

[34] Defendant also briefly mentions his trial counsel's argument that because defendant and Alvarado are brothers-in-law, the codefendants adopted the both-or-neither testifying strategy, at least in part, out of their sense of familial loyalty. Assuming defendant also raises this argument on appeal, he presents no authority that familial loyalty can establish materiality under *Brady*.

[35] Alternatively, we need not and do not reach the issue of whether a showing of legal necessity would be sufficient to establish a *Brady* claim under these circumstances.

where multiple considerations are involved. Defendant has shown only the *possibility* that his decision not to testify was a result of strategic considerations made in connection with Jimenez's statements. In other words, defendant has shown only the *possibility* that he would have testified had the Weil report been timely produced. To establish materiality under *Brady*, defendant must do more than establish a *possible* relationship between the Weil report and a different result; he must establish a *reasonable probability* of a different result. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (*United States v. Agurs*, *supra*, 427 U.S. at pp. 109–110.) Ultimately, defendant's contention that the timely disclosure of the Weil report would have resulted in his testifying is based on speculation and fails to establish materiality under *Brady*. (*Brady*, *supra*, 373 U.S. at p. 87; *Wood v. Bartholomew, supra*, 516 U.S. at p. 6.)

The People raise the related point that considerations entirely independent of Jimenez's statements caused defendant not to testify, regardless of whether the prosecution had disclosed the Weil report. The People point out that if defendant testified, he could have been subject to impeachment by his own prior statements to the police, and his admissions to jailhouse informant Jorge Flores.

In response, defendant attempts to discredit the possible influence of these other impeachment sources. Defendant claims his statements to the police were not preceded by any *Miranda* warning (*Miranda v. Arizona* (1966) 384 U.S. 436), were far from a confession, and might have been excluded in any case as being involuntary. It is true that the People have not shown conclusively that these other impeachment factors independently determined defendant's decision not to testify. But neither has defendant conclusively shown these factors could not have done so. The highly speculative nature of any analysis here further supports our conclusion that defendant has failed to establish materiality under *Brady*.

## 2. *Asserted Violation of Right to Effective Assistance of Counsel*

In the alternative, defendant asserts that regardless of whether the timely disclosure of the Weil report would have caused him to testify, its late disclosure was prejudicial because it violated his right to receive meaningful guidance from his counsel on whether or not to testify on his own behalf. Defendant relies on cases based on the deficient performance of counsel, such as *Wiggins v. Smith* (2003) 539 U.S. 510 [156 L.Ed.2d 471, 123 S.Ct. 2527], which appear inapplicable to the facts of this case. *Wiggins* addressed whether counsel fulfilled his duty to " 'make reasonable investigations' " into defendant's background so that counsel could make a reasonable decision as to what to offer in mitigation at the penalty phase. (*Id.* at p. 522.) Defendant

does not argue that his trial counsel was deficient because he failed to uncover the Jimenez impeachment evidence. Thus, in contrast to *Wiggins*, there is no issue of trial counsel's not becoming aware of relevant evidence through counsel's failure to conduct a reasonable investigation.

Defendant also contends he was in the same situation as Alvarado in regard to the untimely disclosure of the Weil report and consequently he suffered the same interference with his right to receive meaningful guidance from counsel on the issue of whether to testify. But defendant was not in the same situation as Alvarado in relation to the Weil report. As discussed above, Alvarado and defendant stood in different relationships to the Jimenez statements. If Alvarado testified, he faced impeachment with Jimenez's statements. Defendant, in contrast, could testify without being subject to impeachment. Defendant attempts to negate this fundamental difference by claiming that a joint defense strategy committed both codefendants to the same course of action in testifying—that is, either both would testify, or neither would. But, as discussed above, defendant has failed to establish a material connection between Jimenez's statements and defendant's decision to testify. Because there was no material connection, we find no interference with defendant's right to counsel based on the late disclosure of the Weil report.

### 3. *Alleged Prosecutorial Misconduct*

Defendant contends his convictions and sentence should be set aside because the prosecutor engaged in misconduct when he deliberately withheld Weil's report, which rendered the trial fundamentally unfair under the Fourteenth Amendment to the United States Constitution. In addition, defendant contends the trial court erred in finding the prosecutor did not intentionally keep the Weil report secret until after the jury returned the guilty verdict.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11].) As discussed above, because there was no material connection between the Weil report and defendant's decision whether or not to testify, we rejected his claims that the late disclosure of the Weil report violated his constitutional right to due process under *Brady* or his right to the effective assistance of counsel. This same lack of material connection likewise causes us to reject his claim that the late disclosure of the Weil report made his trial fundamentally unfair. As

to whether the prosecutor violated state law by using deceptive or reprehensible methods, we reject that claim based on the trial court's finding, not contradicted in the record, that the prosecutor's failure to disclose was unintentional.[36]

In describing the circumstances surrounding the late-disclosed Weil report, the prosecutor stated that, in September of 1993, after serving the subpoena on Jimenez, Weil told him the following: Jimenez did not want to be a witness; he was scared of what might happen to him or his family; and he might forget what he said or did not really remember what was said. The prosecutor could not recall if he directed Weil to prepare a report in September of 1993, but he believed a report would be prepared. When the prosecutor was reviewing documents in preparation for the penalty phase, he became aware that no such report had been prepared. The prosecutor then directed Weil to prepare a report, and had it delivered to defense counsel. The court made findings in connection with the codefendants' motions for a new trial. It concluded the prosecutor clearly had been negligent in failing to produce the information in the Weil report in a timely manner, but also found the prosecutor had not intentionally kept the Weil report secret until after the jury returned the verdicts.

Defendant contends the court was unreasonable in concluding that the untimely disclosure was not intentional because there were several motions filed and hearings held regarding Jimenez's statements after the time in which the prosecutor became aware of the statements. Defendant claims the prosecutor could not have believed defense counsel was already aware of Jimenez's statements to Weil. Defendant contends it was inconceivable that defense counsel would not have mentioned a "recantation" by Jimenez because such a recantation would have rendered the *Aranda/Bruton* hearings on Jimenez's testimony unnecessary.[37]

---

[36] Prosecutorial misconduct does not require a showing of bad faith. (*People v. Hill* (1998) 17 Cal.4th 800, 822, 829 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Thus, in a typical claim of prosecutorial misconduct involving a prosecutor's presentation to the court or jury, there is no need to address the prosecutor's intent. But in the context of the prosecutorial misconduct claimed here, the only way the actions of the prosecutor can be shown to be deceptive or reprehensible is if the prosecutor had intentionally withheld the Weil report for strategic advantage. In the absence of claims for intentional misconduct, defendant would merely be repeating his *Brady* claim, since nondisclosure under *Brady* does not require a showing of the moral culpability or the willfulness of the prosecutor. (*United States v. Agurs, supra,* 427 U.S. at p. 110.)

[37] Defendant also claims that the prosecutor must surely have also been aware of the Los Angeles Grand Jury investigation concerning jailhouse informants, which had surfaced with much publicity not long before this trial, and that, consequently, the prosecutor should have been on notice that the testimony of a jailhouse informant like Jimenez was likely false. This argument is based on facts not contained in the record. But even assuming the prosecutor was aware of the grand jury investigation, this would add little to defendant's main argument,

The record does not support defendant's claim. It appears the trial court's conclusion was consistent with the prosecutor's statement that when the prosecutor heard Weil's account of Weil's conversation with Jimenez in September of 1993, he understood Jimenez's comments to Weil to be an attempt to get out of testifying because he was unwilling or scared to testify. The prosecutor stated that it was not until after he read the version of the conversation in Weil's March 1994 report, that he was aware of Jimenez's comments that his prior statement to police might be misleading or contain falsehoods due to the drugs he was taking at that time. The prosecutor's understanding of Jimenez's comments to Weil as an attempt to get out of testifying, rather than as a "recantation," is consistent with the prosecutor's apparent lack of surprise that Jimenez's comments to Weil were not mentioned during the *Aranda/Bruton* hearings addressing Jimenez's statements.

## V. PENALTY PHASE ISSUES

### A. *Asserted Violations of International Law*

Defendant contends that his trial and sentence of death are in violation of customary international law under the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the American Declaration of the Rights and Duties of Man, and the International Convention on the Elimination of All Forms of Racial Discrimination. But as discussed above, defendant has failed to establish that any aspect of his trial or penalty determination involved violations of state or federal constitutional law. Therefore, we need not consider whether a violation of state or federal constitutional law would also violate international law. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Had defendant shown prejudicial error under domestic law, we would have set aside the judgment on that basis without recourse to international law. (*Ibid.*) As to whether California's death penalty generally violates international law, we have previously held, as defendant concedes, that international law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. (*Ibid.*; *People v. Ramos, supra,* 34 Cal.4th at pp. 533–534.)

### B. *Miscellaneous Constitutional Challenges to the Death Penalty*

Defendant attacks the constitutionality of California's death penalty statute on numerous grounds. We reaffirm the decisions that have rejected similar claims and decline to reconsider such authorities, as follows:

which is that the prosecutor had *actual knowledge* of the unreliability of Jimenez because the prosecutor knew that Jimenez had admitted it to Weil in September of 1993.

That certain noncapital sentencing proceedings may require jury unanimity or proof beyond a reasonable doubt does not mean the death penalty statute violates the equal protection clause of the Fourteenth Amendment. (*People v. Rogers* (2006) 39 Cal.4th 826, 893 [48 Cal.Rptr.3d 1, 141 P.3d 135] (*Rogers*); *Blair, supra*, 36 Cal.4th at p. 754; *People v. Davis* (2005) 36 Cal.4th 510, 571–572 [31 Cal.Rptr.3d 96, 115 P.3d 417].) "The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*Lewis and Oliver, supra*, 39 Cal.4th at p. 1066, citing *People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Indeed, the trial court need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase. (*Rogers, supra*, 39 Cal.4th at p. 893; *Blair, supra*, 36 Cal.4th at p. 753.)

The Eighth and Fourteenth Amendments do not require that a jury unanimously find the existence of aggravating factors or that it make written findings regarding aggravating factors. (*Rogers, supra*, 39 Cal.4th at p. 893; *Blair, supra*, 36 Cal.4th at p. 753.) In addition, the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 961 [159 L.Ed.2d 851, 125 S.Ct. 21]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]) have not changed our prior conclusions regarding burden of proof or jury unanimity at the penalty phase. (*Lewis and Oliver, supra*, 39 Cal.4th at p. 1066; *Rogers, supra*, 39 Cal.4th at p. 893.)

Section 190.2—setting out the special circumstances that, if found true, render a defendant eligible for the death penalty—adequately narrows the category of death-eligible defendants in conformity with the requirements of the Eighth and Fourteenth Amendments. (*Rogers, supra*, 39 Cal.4th at pp. 892–894; *Blair, supra*, 36 Cal.4th at p. 752; *People v. Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

Section 190.3, factor (a)—which permits consideration of the "circumstances of the crime" as an aggravating factor—is not impermissibly vague and provides adequate guidance to a jury in sentencing. (*People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123] (*Prieto*); *People v. Lewis* (2001) 26 Cal.4th 334, 394 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

There is no requirement under the jury trial guarantee of the Sixth Amendment, the cruel and unusual punishment clause of the Eighth Amendment, or the due process or equal protection guarantees of the Fourteenth Amendment that a jury find the existence of unadjudicated criminal activity under section 190.3, factor (b), unanimously or beyond a reasonable doubt. (*Rogers, supra,* 39 Cal.4th at p. 894; *Blair, supra,* 36 Cal.4th at p. 753.)

The use of restrictive adjectives—i.e., "extreme" and "substantial"—in the list of mitigating factors in section 190.3 does not act unconstitutionally as a barrier to the consideration of mitigation. (*People v. Harris* (2005) 37 Cal.4th 310, 365 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *Brown, supra,* 33 Cal.4th at p. 402; *Prieto, supra,* 30 Cal.4th at p. 276.)

Intercase proportionality review is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution. (*Rogers, supra,* 39 Cal.4th at p. 894; *Blair, supra,* 36 Cal.4th at p. 753.)

Capital punishment per se does not violate the Eighth Amendment's proscription against cruel and unusual punishment. (*People v. Moon* (2005) 37 Cal.4th 1, 47 [32 Cal.Rptr.3d 894, 117 P.3d 591]; *People v. Staten* (2000) 24 Cal.4th 434 [101 Cal.Rptr. 2d 213, 11 P.3d 968].) We have recently rejected the argument that we should reconsider our position in light of the abolition of the death penalty by the nations of Western Europe, and the United States Supreme Court's ruling in *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242] that the execution of mentally retarded persons constitutes cruel and unusual punishment. (*Moon, supra,* 37 Cal.4th at pp. 47–48.)[38]

## VI. CUMULATIVE ERROR

Defendant requests that we consider the cumulative effect of any errors in the pretrial stage, guilt phase, or penalty phase in deciding whether to reverse defendant's convictions and death sentence. Because we conclude there were no individual errors of any kind, we reject defendant's claim that any cumulative effect warrants reversal.

---

[38] Without providing further argument, defendant also contends that asserted errors in the following guilt phase rulings also had prejudicial impact on the penalty phase: denial of severance motion, rulings on the admissibility of evidence of Mary Magoon's alleged propensity for violence and use of firearms, lack of instruction on the elements of torture, admission of the testimony of prosecution's blood spatter expert witness, and admission of crime scene and autopsy photos. Because we discern no error in any area of the guilt phase, we reject defendant's claims of any prejudicial effect in the penalty phase arising from these or any other guilt phase rulings.

## VII. CONCLUSION

We affirm the judgment in its entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 12, 2007.